**MUNFORD, INC., Plaintiff–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Defendant–Appellee.**

**No. 87–8306.**

United States Court of Appeals,
Eleventh Circuit.

July 21, 1988.

David D. Aughtry, George A. Hrdlicka, Robert I. White, Shelley Cashion, Chamberlain, Hrdlicka, White, Johnson, & Williams, Houston, Tex., for plaintiff-appellant.

Michael L. Paup, Chief Appellate Section, Tax Div., Roger M. Olsen, Michael C. Durney, Gary R. Allen, Thomas R. Lamons, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before HATCHETT and CLARK, Circuit Judges, and LYNNE *, Senior District Judge.

HATCHETT, Circuit Judge.

In this appeal, we affirm the United States Tax court's ruling upholding the Commissioner of Internal Revenue's (Commissioner) determination that appellant, Munford, Inc., is not entitled to an investment tax credit with respect to certain structural components of an addition to its refrigerated warehouse.

## I.  FACTS

During its taxable year ended December 30, 1976, Munford, Inc., owned and operated twelve refrigerated warehouses in the southeastern United States, including a facility located in Atlanta, Georgia (the "Gateway Facility").  During that year, Munford completed the construction of and began operating an addition (the Addition) to the Gateway Facility.  The Addition consists of three areas: (1) a refrigerated portion comprising approximately 34,650 square feet; (2) a loading dock and staging area used for loading and unloading trucks, encompassing approximately 3,900 square feet; and (3) a covered rail dock for unloading goods shipped by rail, comprising approximately 1,030 square feet.  Since its inception, Munford has used the Addition to store prepackaged frozen foods, at subfreezing temperatures, on behalf of frozen food processors.  The food processors retain title to the frozen food products pending delivery to their customers in the southeastern United States.  These customers consist primarily of grocery store chains and other food service organizations, including schools and cafeterias.

On its consolidated federal income tax returns for the taxable years ending January 3, 1974 and January 1, 1976, Munford claimed investment tax credit carrybacks

---

* Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama sitting by designation.

from its taxable year ended December 30, 1976, with respect to $581,437 of costs relating to the Addition. Following an audit, the Commissioner disallowed the claimed investment tax credit, except as to certain interior parts of the refrigerated portion of the Addition, such as pipe insulation, valves, and motors.

Following a trial, the Tax Court determined that the Commissioner properly disallowed the investment tax credit to the extent claimed for costs allocable to the structural elements of the refrigerated area. The Tax Court also: (1) disagreed with the Commissioner's finding that the refrigerated area of the Addition constitutes a "building" for purposes of the investment tax credit, and (2) rejected Munford's contention that the structural elements of the refrigerated area constitute property "in the nature of machinery" so as to qualify for an investment tax credit as "tangible personal property" within the meaning of section 48(a)(1)(A) of the Internal Revenue Code.

Having determined that the refrigerated area of the Addition did not qualify as "tangible personal property" within the meaning of section 48(a)(1)(A), the Tax Court considered whether it could qualify as "other tangible property." The Tax Court concluded that the refrigerated area could qualify for an investment tax credit only as "other tangible property" within the meaning of section 48(a)(1)(B) of the Code only if it was used as an integral part of, or in connection with, a "qualifying activity," such as manufacturing or production. Because Munford conceded that the refrigerated portion of the Addition was not used as an integral part of, or in connection with, a "qualifying activity" as delineated in section 48(a)(1)(B), the court held that the refrigerated area was ineligible for an investment tax credit under that section. Consequently, the Tax Court upheld the Commissioner's determination that

Munford is not entitled to an investment tax credit to an extent greater than that allowed by the Commissioner. Munford now appeals.[1]

The sole issue in this appeal is whether Munford is entitled to an investment tax credit under section 38 of the Internal Revenue Code with respect to the entire cost of the refrigerated portion of the Addition.

The Commissioner contends that Munford is entitled to an investment tax credit only with respect to certain interior cooling elements of the Addition.[2]

## II.

The investment tax credit, added to the Internal Revenue Code in 1962, Pub.L. 87-834, 76 Stat. 967 (1962), "[was] designed to increase economic productivity, output, and growth by creating a tax incentive for the purchase of machinery, equipment, and other property used to produce goods or run a business." *Illinois Cereal Mills, Inc. v. Commissioner of Internal Revenue,* 789 F.2d 1234, 1236 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986). *See also A.C. Monk & Co. v. United States,* 686 F.2d 1058, 1060 (4th Cir.1982); H.R.Rep. No. 1447, 87th Cong., 2d Sess. 11 (1962); S.Rep. No. 1881, 87th Cong., 2d Sess. 11 (1962), U.S.Code Cong. & Admin.News 1962, pp. 3297. The credit provisions of the Code, in effect during the relevant tax year for this appeal, allowed a credit, offset directly against income tax liability, for investment in certain types of depreciable property or capital equipment.

In order to qualify for an investment tax credit, property must meet the definition of "section 38 property" which, in turn, is defined in section 48(a)(1) of the Code. In 1976, the tax year in question, section 48(a) defined "section 38 property," in pertinent part, as follows:

---

1. Munford appeals the Tax Court's ruling only with respect to the refrigerated portion of the Addition. It does not challenge the Tax Court's rulings concerning depreciation allowances and investment tax credits with respect to the two loading docks.

2. All references to "section ____" or to "Treasury Regulation section ____" are to the Internal Revenue Code of 1954, and the Treasury Regulations promulgated thereunder, as amended and effective in 1976.

(a) *Section 38 Property—*

(1) *In general.*—Except as provided in this subsection, the term 'section 38 property' means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constitutes a research facility used in connection with any of the activities referred to in clause (i), or

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state)....

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of three years or more.

26 U.S.C. § 48(a)(1) (1976). Thus, the Code establishes two ways that property may qualify as section 38 property: (1) by qualifying as "tangible personal property" within the meaning of section 48(a)(1)(A), or (2) by qualifying as "other tangible property"

other than a building and its structural components if such property is used as an integral part of, or used in connection with, one of the qualifying activities delineated in section 48(a)(1)(B)(i).

Munford concedes that when enacting the investment tax credit provisions as part of the Revenue Act of 1962, Congress specifically excluded buildings and their structural components from eligibility for the credit. As the Fourth Circuit acknowledged in *A.C. Monk & Co.:*

> In not allowing credits for investments in buildings and their structural components, Congress felt that businesses would respond more greatly to net price reductions in integral manufacturing and production machinery than in *buildings* and that such investments would further the economy-spurring goals of the tax credit more than would investments in buildings.

*A.C. Monk & Co.,* 686 F.2d at 1060 (citing H.R.Rep. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 413) (footnote omitted) (emphasis added).

In accord with the Fourth Circuit's observation in *A.C. Monk & Co.,* the Commissioner notes that under Treasury Regulation § 1.48–1(c), the term "tangible personal property" does not include "land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)." [3]

---

**3.** Treasury Regulation § 1.48–1(c) provides:

(c) *Definition of tangible personal property.* If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not 'tangible' or 'personal.' Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term 'tangible personal property' means any tangible property except land and improvements thereto, such as buildings

or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building, constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even

Because in the Commissioner's view, the Addition constitutes a building, he contends that the Addition is thereby categorically excluded from the definition of the term "tangible personal property." In response, Munford, while denying that the Addition is a "building" for purposes of the investment tax credit, contends that the Addition is, in essence, a "giant refrigerator or freezer"; therefore, it constitutes "tangible personal property" because it is "property which is in the nature of machinery" described in the penultimate sentence of Treasury Regulation section 1.48–1(c).

## III. WHETHER THE ADDITION IS A BUILDING

■ We first address the issue of whether the Tax Court's determination that the Addition is not a building, is clearly erroneous. *See Royster v. Commissioner of Internal Revenue*, 820 F.2d 1156, 1157 (11th Cir.1987) (review of Tax Court's factual determinations is governed by the "clearly erroneous" standard of Fed.R.Civ.P. 52(a)); *Turner v. Commissioner of Internal Revenue*, 812 F.2d 650, 654 (11th Cir.1987) (same).

Although Congress did not provide a definition for the term "building" for purposes of the investment tax credit when passing the Revenue Act of 1962, the term is defined in section 1.48–1(e)(1) of the Treasury Regulations as:

any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display,

or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores.

Treas.Reg. § 1.48–1(e)(1). Although it is clear that Congress intended that the term "building" be accorded its commonly accepted meaning, a precise definition of the term has remained elusive and the Tax Court has noted, "as used in this context, 'has caused much consternation among taxpayers and has produced a correspondingly large amount of litigation.' " [4] *Munford, Inc. v. Commissioner*, 87 T.C. 463, 478 (1986) (quoting *Scott Paper Co. v. Commissioner*, 74 T.C. 137, 177 (1980) (citations omitted)).

In determining whether a structure is a "building" for investment tax credit purposes, federal courts have generally applied a twofold test, which considers both the "appearance" and "function" of the particular structure. *See, e.g., Illinois Cereal Mills, Inc. v. Commissioner of Internal Revenue*, 789 F.2d 1234, 1238–39 (7th Cir.1986); *Consolidated Freightways, Inc. v. Commissioner of Internal Revenue*, 708 F.2d 1385, 1387–90 (9th Cir.1983); *A.C. Monk & Co. v. United States*, 686 F.2d 1058, 1061 (4th Cir.1982).

The "appearance test" has its genesis in that portion of Treasury Regulation § 1.48–1(e)(1) which states that a building "generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof...." Treas.Reg. § 1.48–1(e)(1). As the Tax Court noted, it is clear from both the testimony of witnesses, as well as photographs in the record,

though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

**4.** The House and Senate Reports accompanying the Revenue Act of 1962, closely track the language of Treas.Reg. § 1.48–1(e)(1) and lend credence to the Commissioner's argument that Congress originally intended that the term "building" be accorded its commonly accepted meaning:

Buildings and structural components thereof are not eligible for the credit. The term 'building' is to be given its commonly accept-

ed meaning, that is, a structure or edifice enclosing a space within its walls, and usually covered by a roof. It is the basic structure of an improvement to land the purpose of which is, for example, to provide shelter or housing or to provide working, office, display, or sales space. The term would include, for example, the basic structure used as a factory, office building, warehouse, theater, railway or bus station, gymnasium, or clubhouse.

H.R.Rep. No. 1447, 87th Cong., 2d Sess. (1962–3 C.B. at 516); S.Rep. No. 1881, 87th Cong., 2d Sess. (1962–3 C.B. 707, 858–59), U.S.Code Cong. & Admin.News 1962, p. 3456.

that in appearance, the Addition to Munford's refrigerated warehouse resembles a building. Because Munford has not argued to the contrary in either the Tax Court or on appeal, we are satisfied that the Tax Court's finding is not clearly erroneous. As mentioned previously, however, the "appearance test" is not dispositive of whether the Addition is a "building" under Treas. Reg. § 1.48–1(e)(1). Accordingly, we now focus our attention on whether the Tax Court properly found that the refrigerated portion of the Addition is not a building because it does not satisfy the "functional test" of the regulation.

Similar to the "appearance test" which is derived from Treas.Reg. § 1.48–1(e)(1), the "function test" is also derived from a portion of that same regulation which provides that a structure is a building if its "purpose ... is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space." Treas. Reg. § 1.48–1(e)(1). A structure qualifies as a building under the functional test if its purpose is one of those enumerated in the regulation, or, is another purpose which could be added to those enumerated in the regulation "without violating the constraining rules of *ejusdem generis.*" *Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915, 919 (9th Cir.1974).

In determining that the refrigerated portion of Munford's Addition did not qualify as a building under the functional test of Treas.Reg. 1.48–1(e)(1), the Tax Court reasoned:

> We think that the principal purpose or function of the refrigerated area is not to furnish working space for petitioner's employees, but rather, to provide an area in which frozen foods may be stored at low temperature. In contrast with the truck and rail loading platforms, the refrigerated area of the Addition is maintained at a temperature which limits, rather than promotes, human activity. Due to the cold temperature, the activities of petitioner's employees are limited in both scope and duration. In the case of the Addition's refrigerated area, the structure itself serves the principal function of low temperature storage of prod-

ucts, and the activities of petitioner's employees are merely supportive of and ancillary to this function. Accordingly, we conclude that the refrigerated portion of the Addition is not a building under the functional test.

*Munford,* 87 T.C. at 483.

In reviewing this determination, we begin with the premise that "in the investment tax credit context, the term 'building' has become a term of art," notwithstanding Congress's original intent that the term be accorded its commonly accepted meaning. *Munford,* 87 T.C. at 478; *see also* H.R.Rep. No. 1447, 87th Cong., 2d Sess. (1962–3 C.B. 405, 516). Indeed, were we to accept the Commissioner's assertion that the term "building" be interpreted only as that term is understood in common parlance, we would circumscribe the class of structures eligible for the investment tax credit. *See, e.g., Brown and Williamson Tobacco Corp. v. United States,* 491 F.2d 1258 (6th Cir.1974) (tobacco drying sheds are not buildings because they provide only incidental working space); *Thirup v. Commissioner of Internal Revenue,* 508 F.2d 915 (9th Cir.1974) (a greenhouse is not a building by function); *Brown–Forman Distillers Corp. v. United States,* 205 Ct.Cl. 402, 499 F.2d 1263, 1269–72 (1974) (whiskey maturation facilities are not buildings based on function).

The Commissioner argues that under the functional test of Treas.Reg. § 1.48–1(e)(1), the Addition is a "building" because its sole purpose is to serve as a warehouse for the storage of prepackaged frozen goods. While it is true, the Commissioner argues, that the sub-freezing temperatures within the refrigerated area are not conducive to human activity, Treas.Reg. § 1.48–1(e)(1) also provides that a structure is a "building" for purposes of the investment tax credit if its function is to provide "shelter." In this regard, the Commissioner notes that Treas.Reg. § 1.48–1(e)(1) expressly provides that the term "building" includes a structure used as a warehouse. Munford, urges that the Commissioner misstates the functional test of Treas.Reg. § 1.48–1(e)(1) by placing undue emphasis on the word

"shelter" without addressing the dispositive question whether the structure provides working space that is more than merely incidental to the primary purpose of the structure.

Simply denominating a structure as a warehouse does not necessarily warrant a finding that the structure is a "building" under Treas.Reg. § 1.48–1(e)(1). *Merchants Refrigerating Co. v. Commissioner*, 60 T.C. 856, 859 (1973). As the Tax Court noted, the major focus of inquiry under the functional test is whether the structure provides working space which is more than merely incidental to the main purpose of the structure. *See, e.g., Consolidated Freightways*, 708 F.2d at 1388–89. In this case, the evidence establishes that Munford's employees entered the refrigerated area of the Addition "only to store or remove goods, take inventory, and perform occasional repairs and maintenance." *Munford*, 87 T.C. at 485. Like the Tax Court, we find these activities to be of insufficient magnitude to compel a finding that the human activity inside the refrigerated area is anything other than incidental to its primary purpose of maintining sub-zero temperatures to prevent the spoilage of frozen foods. Accordingly, we hold that the Tax Court's finding that the refrigerated area of the Addition is not a "building" within the meaning of Treas. Reg. § 1.48–1(e)(1), is not clearly erroneous. *See also Catron v. Commissioner*, 50 T.C. 306 (1968) (holding that the refrigerated area of a large Quonset-type structure used for the cold storage of apples was eligible for the investment tax credit as a qualifying storage facility under section 48(a)(1)(B)(ii) as then in effect); *Merchants Refrigerating*, 60 T.C. at 856 (holding that a large freezer room which was used for the storage of frozen foods was not a building, and that it qualified as a storage facility under section 48(a)(1)(B)(ii) as then in effect); *Central Citrus Company v. Commissioner*, 58 T.C. 365 (1972) (holding that atmospherically controlled "sweet rooms" used to ripen fruit were not buildings, and that they qualified as storage facilities under section 48(a)(1)(B)(ii) as then in effect).

## IV. WHETHER THE REFRIGERATED PORTION IS TANGIBLE PERSONAL PROPERTY

Having concluded that the refrigerated portion of the Addition is not a building, we now consider the issue of whether the refrigerated area is, as Munford contends, tangible personal property under section 48(a)(1)(A) of the Code, and hence eligible for an investment tax credit to an extent greater than the Commissioner allowed. As previously indicated, the Commissioner disallowed the claimed investment tax credit except with respect to certain cooling elements of the refrigerated area, such as its pipe insulation, valves, and motors. "Thus, the remaining costs for which [Munford] is seeking the investment tax credit relate, in essence, to the structural elements of the refrigerated area of the Addition, including its foundation, footings, walls, floor, roofing and supports, vapor barrier, insulation, and electrical components allocable thereto...." *Munford*, 87 T.C. at 488.

Section 48(a)(1) of the Code delineates two categories of section 38 property: "tangible personal property" within the meaning of section 48(a)(1)(A) and "other tangible property" within the meaning of section 48(a)(1)(B). Because the Tax Court found, and Munford has conceded, that the refrigerated portion of the Addition is not "other tangible property" because the refrigerated area is not used as an integral part of, or in connection with, a qualifying activity under section 48(a)(1)(B), we only concern ourselves with the definition of the term "tangible personal property" as that term is used in section 48(a)(1)(A) of the Code.

Unlike section 48(a)(1)(B), section 48(a)(1)(A) excludes from its scope not only "buildings," but also other inherently permanent structures and their structural components. *See* Treas.Reg. § 1.48–1(c). The Addition, affixed to the land by means of a concrete foundation placed at a depth of approximately two to three feet, is an inherently permanent structure. Indeed, the evidence at trial established that the

structural elements of the Addition could not be removed without destroying the physical integrity of the structure itself. Thus, we agree with the Tax Court that the Addition is an inherently permanent structure. *Munford*, 87 T.C. at 489.[5]

Munford, relying upon the penultimate sentence of Treas.Reg. 1.48–1(c), contends that property "which is in the nature of machinery" may qualify as "tangible personal property," notwithstanding the fact that it is an inherently permanent structure. *See* Treas.Reg. 1.48–1(c) ("[A]ll property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building."). Thus, Munford contends that because the structural components of the refrigerated area of the Addition operate together with the refrigeration system components to cause the refrigerated area to function in much the same manner as a giant refrigerator or freezer, the entire refrigerated area should be considered "property ... in the nature of machinery." The Commissioner, while acknowledging that property in the nature of machinery may qualify as tangible property even if it is inherently permanent, disagrees with the applicability of Treas.Reg. 1.48–1(c) because the Commissioner rejects Munford's characterization of the refrigerated area of the Addition as property in the nature of machinery.[6]

Munford's reliance upon Treas.Reg. 1.48–1(c) is heavily predicated upon *Weirick v. Commissioner*, 62 T.C. 446 (1974), wherein the Tax Court construed that portion of Treas.Reg. 1.48–1(c) which relates to "property which is in the nature of machinery." At issue in *Weirick* was whether the amounts expended for the construction and installation of ski lift cable support and holddown towers (line towers) and passenger ramps qualified as section 38 property eligible for the investment tax credit. The line towers, located at various points between the upper and lower terminals of the ski lift, were designed to support or hold down the lift cable. Attached to the line towers were sheave assemblies, which consisted of rubber-tired pullies upon which the ski lift would travel. The Commissioner conceded that the sheave assemblies functioned as property in the nature of machinery and were thus eligible for the investment tax credit. Loading and unloading passenger ramps were also located at both the upper and lower terminals. As stated in the Tax Court's findings, these ramps were either of the wooden type, in which case they merely rested on pads and could be moved without great difficulty, or the "earthen" type, in which case they had been constructed out of mounds of dirt, which had either been hauled or bulldozed to the lift site from surrounding areas. *Weirick*, 62 T.C. at 455.

In determining whether the Commissioner properly disallowed the claimed invest-

---

5. In *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. 664, 672–73 (1975), the Tax Court enumerated six factors which should be considered in determining whether property is an inherently permanent structure:

(1) Is the property capable of being moved and has it in fact been moved?

(2) Is the property designed or constructed to remain permanently in place?

(3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved?

(4) How substantial a job is removal of the property and how time-consuming is it?

(5) How much damage will the property sustain upon its removal?

(6) What is the manner of affixation of the property to the land?

*Whiteco Industries*, 65 T.C. at 672–73.

6. Some discrepancy exists between the Commissioner's position during the proceedings in the Tax Court and on appeal as to whether Treas. Reg. § 1.48–1(c) excludes from the definition of "tangible personal property" all structures which are "inherently permanent," even if they constitute "property which is in the nature of machinery." For instance, the Tax Court noted that "Respondent [the Commissioner] acknowledges that, under section 1.48–1(c), Income Tax Regs., property which is in the nature of machinery may qualify as tangible personal property even if it is inherently permanent." *Munford*, 87 T.C. at 490. Yet, in his brief on appeal, the Commissioner argues that "even if taxpayer's warehouse were 'property * * * in the nature of machinery' it would not qualify as tangible personal property since there is no dispute that such structure is inherently permanent."

ment tax credit for the line towers, the court initially observed that the "[t]he *only* purpose of the [line] towers [was] to serve as a support for the sheave assemblies, elevating them or lowering them to the desired height." *Weirick*, 62 T.C. at 454 (emphasis added). Moreover, as the Tax Court noted, because "[t]he towers and the sheave assemblies were physically connected, ... when replacement was necessary, it was often as economical to replace the tower and its related sheave assembly as to simply replace the sheave assembly on an existing tower." *Munford*, 87 T.C. at 491. Thus, realizing that the line towers and sheave assemblies were a unitary mechanism from a functional standpoint, the *Weirick* court concluded that the line towers were "tangible personal property" within the meaning of section 48(a)(1)(A). The Tax Court reached this conclusion because the line towers, like the sheave assemblies, functioned as property in the nature of machinery. *Weirick*, 62 T.C. at 454.

Finally, with regard to the passenger ramps, the court found that even if the entire ski lift were removed, the earthen ramps would normally remain at the site because of the expenses involved in removing the dirt. Accordingly, the court agreed with the Commissioner that the earthen ramps were inherently permanent structures which did not qualify for the tax credit. *Weirick*, 62 T.C. at 455. As to the wooden ramps, however, the court concluded that those structures were not inherently permanent in light of the fact that they could be easily transported because "[t]hey [were] not imbedded in or firmly attached to the concrete pads on which they [stood]." *Weirick*, 62 T.C. at 455. Consequently, the court determined that the wooden ramps qualified as "tangible personal property."

Before applying the rationale of *Weirick* to the facts of this case, it is important that we place the scope of our inquiry in proper perspective. As the Tax Court observed, the issue before the *Weirick* court was not whether the entire ski lift constituted property in the nature of machinery and, therefore, qualified as "tangible personal prop-

erty." Rather, the issue presented in *Weirick*, whether the line towers and passenger ramps qualified as section 38 property, called for an individualized determination of whether each of those component parts was eligible for the investment tax credit. Having framed the issue, our inquiry in this case is not to consider whether the refrigerated area of the Addition, as a whole, constitutes property in the nature of machinery. Rather, the question presented is whether the structural elements of the refrigerated area qualify as property in the nature of machinery and are eligible for the investment tax credit.

■ Having considered the record, we are not persuaded that the structural elements of the refrigerated area of the Addition constitute property in the nature of machinery. First, as the Tax Court found, the structural elements of the refrigerated area perform an entirely different function from the function performed by the refrigeration system components of the Addition. For instance, although the structural elements of the Addition work in conjunction with the refrigeration system components, the structural components and refrigeration system of the Addition do not serve an inseparable purpose, similar to the manner in which the sheave assemblies and line towers functioned in *Weirick*. As the Tax Court found:

> Here, the refrigeration system can operate independently of the structural elements, and the structural elements themselves serve a function independent of the refrigeration system—that of keeping out humidity and reducing temperature migration, and providing an enclosed, protected space in which frozen foods may be stored. Thus, we do not think that the structural elements can be said to be so closely related to the refrigerated system as to be considered therewith a single asset which is in the nature of machinery under the rationale of *Weirick*....

*Munford*, 87 T.C. at 493. Moreover, unlike the line towers and sheave assemblies in *Weirick* which were so integrally related that it was just as economical to replace

both as it was to replace only the sheave assemblies, no similar showing has been made that it would be just as economical to replace both the refrigeration system components and structural components as it would be to replace only the refrigeration system components themselves. Indeed, the Tax Court agreed with the Commissioner's view that the refrigeration system could be replaced without replacing the structural elements. *Munford,* 87 T.C. at 493.

■ We are aware of the conflicting evidence in the record concerning the interdependent relationship between the cooling elements of the Addition, for which a credit was allowed and, its structural elements, for which a credit was disallowed. Nevertheless, it is well-settled that "where there are two permissible views of the evidence, the tax court's choice between them cannot be clearly erroneous." *Piggly Wiggly Southern, Inc. v. Commissioner of Internal Revenue,* 803 F.2d 1572, 1576 (11th Cir.1986) (discussing the "clearly erroneous" standard of review of factual determinations made by the Tax Court). Accordingly, we hold that the Tax Court properly sustained the Commissioner's determination that the structural elements of the refrigerated area of the Addition do not qualify as tangible personal property under section 48(a)(1)(A) of the Code and Treas. Reg. § 1.48–1(c).[7]

### CONCLUSION

In summation, we hold (1) that the Addition is not a "building" within the meaning of section 48(a)(1)(A) of the Code and Treas.Reg. § 1.48–1(e)(1) and; (2) that the structural elements of the refrigerated area of the Addition do not qualify as "tangible personal property" under section 48(a)(1)(A) of the Code and Treas.Reg. § 1.48–1(c). Accordingly, we affirm the Tax Court's determination that Munford is not entitled to an investment tax credit with respect to the refrigerated portion of the Addition to an extent greater than that allowed by the Commissioner.

AFFIRMED.

CLARK, Circuit Judge, dissenting:

Because I find the reasoning in the tax court and majority opinions to be internally inconsistent, I respectfully dissent.

First, both courts adjudicate that the Addition is not a building. Then, both conclude that the Addition is not tangible personal property. The facts, statute, regulations, case law and commonsense which require the first conclusion necessarily lead one to the deduction that the Addition is in fact and in law tangible personal property. Neither court tells us what the Addition is, when it is quite obviously a giant refrigerator. A refrigerator is tangible personal property by regulation. The taxpayer had constructed for his business a giant refrigerator instead of housing one or a number

---

7. We express no view as to whether a refrigerated structure such as the Addition would fall within the scope of Treas.Reg. § 1.48–1(e)(1)(i)'s exclusion from the definition of the term "building" all property which is "essentially an item of machinery or equipment." The language of section *1.48–1(e)(1)(i)* is arguably broader than the language of Treas.Reg. § 1.48–1(c) which defines the term "tangible personal property" to include all "property which is in the nature of machinery" because Treas.Reg. § 1.48–1(c) encompasses only "machinery" while Treas.Reg. § 1.48–1(e)(1)(i) includes not only machinery but also "equipment." "Therefore, the fact that property would be considered an 'item of machinery or equipment' within sec. 1.48–1(e)(1)(i), Income Tax Regs., does not mean that it must also be considered to be 'property which is in the nature of machinery' within section 1.48–1(c), Income Tax Regs." *Munford,* 87 T.C. at 491 n. 31. This conclusion is buttressed by

the fact that included within the scope of Treas. Reg. § 1.48–1(c) as examples of "property which is in the nature of machinery" are "gasoline pump[s], hydraulic car lift[s], or automatic vending machine[s], although annexed to the ground." Conversely, included within the scope of structures which are essentially an item of machinery or equipment under *Treas.Reg. § 1.48–1(e)(1)(i)* are such structures as "oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples." Thus, contrary to Munford's contention, comparison of the types of structures which would qualify as property in the nature of machinery under Treas.Reg. § 1.48–1(c) and structures which are essentially an item of machinery or equipment under Treas.Reg. § 1.48–1(e)(1)(i), belies the assumption that the two regulations are coextensive as far as use of the word machinery is concerned.

of large refrigerators inside a building. If he had done the latter, he would have received the investment tax credit for the refrigerators. He should not be penalized by the innovative approach used and should receive the investment tax credit intended by Congress.

## I. Is it a building?

In holding that the Addition was not a "building", the tax court in *Munford, Inc. v. Commissioner*, 87 T.C. 463 (1986), made the following various comments in its opinion:

> We think that the refrigerated area of the Addition is not fairly distinguishable from those structures held not to be buildings in *Catron, Central Citrus* and, more particularly, *Merchants Refrigerating*. Thus, following our decisions in those cases, we hold that the refrigerated area of the Addition is not a building.

*Id.* at 485 (footnotes omitted).

> In Rev.Rul. 74–452, 1974–2 C.B. 11, respondent has indicated that warehouses are generally "conventional buildings used for general storage purposes." Although respondent concluded therein that certain refrigerated structures used for storing frozen foods were warehouses and not sec. 38 property, we do not think that a facility such as the Addition is a "conventional building used for general storage purposes." First, the Addition is not a conventional building, since it contains numerous construction features which would not be found in a conventional or "dry" warehouse. Second, the Addition is not, in our view, used for "general storage purposes," but rather, is both designed and used for the much more specific purpose of storing frozen foods at low temperatures. Thus, notwithstanding respondent's contrary conclusion in Rev.Rul. 74–452, we do not think that a structure like the Addition can fairly be considered a "warehouse" as that term has been used by respondent in the cited ruling.

*Id.* at 485–86 n. 21.

In response to the Commissioner's argument that the Addition could be used as a conventional warehouse, the court stated:

Furthermore, even if we considered adaptability to be a relevant factor in this context, we would still reject respondent's position, since we think that the Addition is not reasonably adaptable to uses other than low temperature storage. Respondent contends that if the refrigeration system were simply switched off, the Addition could be economically used as a dry warehouse. However, petitioner provided credible testimony, supported by pro forma financial statements, to show that the Gateway Facility, of which the Addition was a part, could be operated profitably as a refrigerated facility, but would operate at a substantial loss if used as a dry warehouse. We find this evidence to be convincing.

*Id.* at 487.

To understand why the tax court reached this conclusion and to explain why I conclude that the Addition is a giant refrigerator, it is helpful to know the nature of the construction of the Addition as found by the tax court:

> The foundation of the Addition consists of concrete footings which support the structure. In order not to be affected by the cold temperatures within the Addition, the footings are placed at a depth of 2 to 3 feet below the floor. Above the foundation, there is a system of under-floor ventilation pipes intended to prevent the earth below the structure from freezing; without this system, frost buildup in the fill beneath the Addition would eventually cause the concrete slab floor of the structure to heave and crack. Air is drawn through the ventilation system by fans, and the system can be enhanced if necessary, by forcing heated air through the pipes.
>
> The under-floor ventilation system is covered by a bed of sand. Above the sand bed is a "vapor barrier" consisting of polyethylene laid out in large sheets. The vapor barrier, which extends from beneath the floor and continues vertically inside the walls of the Addition, is intended to prevent moisture from penetrating the Addition. The portion of the vapor

barrier located beneath the floor is sealed at the joints to prevent any moisture penetration from the earth, and is covered by 6 inches of low temperature insulation. This insulation was placed directly upon the vapor barrier in two segments, or "boards," which were staggered at the joints to reduce channels for temperature migration.

The floor of the Addition consists of a concrete slab which was poured over the low temperature insulation. Since contraction in the floor could occur as a result of the low temperatures within the Addition, a number of contraction joints were provided in the slab to minimize the possibility of cracking. Moreover, since the slab rests upon low temperature insulation, which is rather compressible relative to normal soil, the slab contains long steel rod dowels inserted in sleeves across the contraction joints in order to maintain proper alignment of the slab surface. Nothing protrudes from the floor surface but concrete curbs which line the base of the walls and act as bumper guards for the forklifts.

The outer walls of the Addition consist of "tilt-up" concrete panels which were cast on site using conventional building materials and tilted into place. At the corners abutting the floor and walls of the structure, the continuity of the polyethylene vapor barrier is maintained. The sheets comprising the vapor barrier extend up along the inside of the walls of the structure and are hung from a point near the top of the walls. The joints of the vapor barrier are sealed.

The vapor barrier is covered within the walls of the Addition by 8 inches of low temperature insulation. This insulation was erected against the walls in two layers, with staggered joints to minimize temperature migration. To protect and provide continuity for the vapor barrier and the insulation, a high strength corner flashing (reinforcement material) is located at the joints where the wall insulation and the floor insulation overlap. Similarly, continuity of the vapor barrier and insulation is maintained by means of overlapped joints at the abutting wall

corners of the structure. The insulation layers are covered on the interior of the structure by ⅝-inch type "X" fire-resistant gypsum board. The gypsum board is intended to protect the insulation from damage. In addition, since it is highly flammable, the insulation is required by fire code guidelines to be enclosed in an air tight manner, and the gypsum board also performs this function. The insulation and the vapor barrier are not visible in the finished Addition, and cannot be removed without tearing out the existing wall and floor structures.

The roof of the Addition is constructed of steel decking. In order to maintain continuity of the vapor barrier and insulation at the juncture of the roof and the walls, the roof is not supported by the walls of the structure, but rather, rests upon columns of structural steel located within the Addition near the walls. The gap between the roof and walls is designed to allow the vapor barrier and insulation to "turn the corner" from the walls and continue along the roof without interruption.

The roof has 10 inches of low temperature insulation, comprised of two layers. A continuous wood blocking is bolted to the roof deck near the perimeter of the deck (near the upper portion of the walls) and the first layer of roofing insulation is located between the blocking and the wall insulation under compression, forming a tight seal. In addition to the low temperature insulation, the roof also contains two layers of noncombustible insulation board. The lower layer serves to separate the steel deck from the flammable low temperature insulation, and the upper layer was installed principally to allow hot bitumen (asphalt) to be mopped onto the built-up roof without damaging the low temperature insulation. Each layer of insulation board is attached to the low temperature insulation by means of adhesives. The joints of both the noncombustible and low temperature insulation are staggered to reduce channels for temperature migration. The built-up roofing of the Addition serves as a con-

tinuation of the vapor barrier and insulation as found within the walls and beneath the floor of the structure.

\* \* \* \* \* \*

The refrigerated area of the Addition covers 34,650 square feet. It contains multi-level storage racks with openings sized to accommodate products stacked on pallets and lifted into place by forklifts. The aisles of the refrigerated area are wide enough to accommodate the movement of the forklifts operated by petitioner's employees. Lighting in this area is provided by special low temperature mercury vapor lamps, since normal commercial fluorescent lighting will not work in the low temperatures maintained therein.

*Id.* at 468–71.

The Addition has two special compartments, or vestibules, located between the refrigerated area and the truck loading platform. These vestibules function as "air locks" and help prevent the warmer outside air and moisture from entering the refrigerated area. The vestibules are constructed so as to maintain continuity of the vapor barrier and insulation. Each time the outer door of a vestibule opens, the interior of the vestibule receives an influx of warm, moist air. To prevent freezing of this moisture, heat lamps are used in the vestibules to maintain above-freezing temperatures for the inner floor, wall, and ceiling surfaces, as well as the door hinges. At night, the exterior of each vestibule is sealed off by heavy, metal-clad doors containing low temperature insulation. The perimeter of each door contains gaskets which form a seal with the wall insulation. These gaskets also contain heat cables to prevent freezing of condensation which could otherwise cause the doors to jam.

*Id.* at 473.

II.  Is it tangible personal property?

The crucial issue becomes whether the Addition is "tangible personal property." If so, the property qualifies for the investment tax credit. The definition is found in section 1.48–1(c), Income Tax Regs.:

(c) *Definition of tangible personal property.*—If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal." Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, *property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property.* For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, *refrigerators*, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

In applying this definition it is necessary to reconsider the nature and use of the property involved. The tax court assists us in recounting the determination made by the Commissioner. The respondent in this case

has allowed the credit for certain refrigeration system components of the Addition, including refrigeration pipes and pipe insulation, valves, and motors, having a cost of $103,470.12. Thus, the remaining costs for which petitioner is seeking the investment tax credit relate, in essence, to the structural elements of the refrigerated area of the Addition, including its foundation footings, walls, floor, roofing and supports, vapor barrier, insulation, and electrical components allocable thereto, having a cost of $404,585.

87 T.C. at 488 (footnote omitted).

The use of the property is conceded to be for refrigeration only. In note 21 of his opinion in discounting the Commissioner's argument that the Addition was a warehouse, the court said: "the Addition is not, in our view, used for 'general storage purposes,' but rather, is both designed and used for the much more specific purpose of storing frozen foods at low temperatures."

In finding that the Addition was not personal property, the tax court returned to the definition of a building which states " 'tangible personal property' means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)". The tax

court then proceeded to reject the rationale used in finding the Addition not to be a building and finds it not to be tangible personal property. There is no question that "refrigerators" are specifically listed as tangible personal property in the definition of that term. The tax court found that the Addition had no use but that of a refrigerator, but then on page 492 says: "our inquiry must focus, not upon the refrigerated area of the Addition as a whole, but rather, upon the structural elements thereof for which petitioner is seeking an investment tax credit".

The tax court's focus went awry when it decided that the walls, roof, foundations, etc. were "structural components" and ignoring Sec. 1.48–1(e), Definition of building and structural components.[1] While true in most cases, those components were not *principally* structural in this case. The under-floor ventilation pipes to prevent the earth from freezing, the vapor barrier, the insulation to prevent temperature migration, the contraction joints to prevent the floor from buckling, the "tilt-up" panels, et al. were not structural components within the meaning of Sec. 1.48–1(e). See emphasized portions of regulation in footnote. There is no logic in allowing the tax credit for an oil and gas storage tank used in the distribution of those products and disallowing the credit for a giant refrigerator used in the distribution of foodstuffs.

In enacting the investment tax credit Congress wished to stimulate commerce by encouraging investment in properties that would assist in expanding the economy. It

1. Sec. 1.48–1(e). *Definition of building and structural components.*

(1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * *Such term does not include (i) a structure which is essentially an item of machinery or equipment,* or (ii) a structure which houses property used as

an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact *that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes.* Thus, the term "building" *does not include* such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

**1412**

is elementary that the production of foodstuffs largely goes to naught without a system of distributing those foodstuffs to consumers. The taxpayer's giant refrigerator is a link in that distribution chain and it is nonsense to penalize him for choosing to construct one large refrigerator rather than build a warehouse and then construct a series of large refrigerators inside the warehouse. Taxpayer started in the ice business in 1909 and owned and operated 12 refrigerated facilities in the southeastern United States when the Addition was constructed. One can assume from such experience that taxpayer concluded that the giant refrigerator was the best competitive investment rather than choosing the large individual refrigerators within a warehouse. Presumably his decision would lead to more competitive pricing of foodstuffs which is what the system is all about.

Thus, I respectfully dissent from the majority opinion which affirms the tax court.