Jake Z. **SCHRUM**; **Ruby E. Schrum; Dannie L. Schrum; Jeanette V. Schrum; Donald L. Moore; Judith A. Moore, Petitioners–Appellants,**

v.

**COMMISSIONER of the INTERNAL REVENUE SERVICE, Respondent– Appellee.**

No. 93–1814.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 8, 1994.

Decided Sept. 1, 1994.

Donald L. Moore, Hampton, VA, argued, for appellant.

Randolph L. Hutter, Tax Div., U.S. Dept. of Justice, Washington, DC, argued (Michael L. Paup, Acting Asst. Atty. Gen., Gary R. Allen, Kenneth L. Greene, on brief), for appellee.

Before RUSSELL, Circuit Judge, CHAPMAN, Senior Circuit Judge, and TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge DONALD RUSSELL wrote the opinion, in which Senior Judge CHAPMAN and Judge TILLEY joined.

### OPINION

DONALD RUSSELL, Circuit Judge:

This case raises the question of whether self-service carwash facilities, or portions thereof, qualified under an old version of the tax code for an investment tax credit and for treatment normally accorded personal property for depreciation purposes. The tax court upheld the determination of the Commissioner that only in small measure was this the case. We affirm in part, vacate in part, and remand.

## I.

The relevant facts are not in dispute and are presented in the opinion of the tax court below, *Schrum v. Commissioner*, 1993 T.C.M. (RIA) ¶ 93,124, 1993 WL 91293 (Mar. 30, 1993) (Wells, J.). We summarize them here.

Appellants-taxpayers Jake Z. Schrum, Dannie L. Schrum and Donald L. Moore were the general partners of Peninsula Enterprises ("Peninsula"), a Virginia general partnership. During the 1980's, Peninsula constructed four carwashes, acquired four other carwashes, and operated all eight carwashes as its primary business.

With the exception of the number of bays, all the facilities are substantially identical and were specifically designed to function as self service carwashes. The facilities are constructed of metal, brick and concrete. Customers may select water with or without soap added, and may select a low or high water pressure. The facilities are fully self-service; although the partnership retains a maintenance crew which maintains all its facilities, crew members do no work for customers.

The carwash facilities have larger than normal water supply meters and drain lines and have electricity and gas supplies. The water and electricity are used only in running the equipment.

With the exception of two carwash facilities, the ends of the bays are completely open; the two for which this is not the case have walls extended like a 'T' which lead customers into the bays. None of the carwash facilities has doors on the bays. Additionally, the bays do not have foundations which would support a wall or door on the open ends.

Vertical walls separate the bays from one another. These walls prevent customers from spraying water into the next bay and guide water down to the sloped floor, under which are located, as described below, water collection tanks. Also, the walls partially enclose vaults which contain coins deposited by customers. Mounted on the walls are the coin meters and switches, electrical wires to the switches, brackets for the wands used by

the customers to direct the water onto their cars, and the hoses which lead to the wands. The mat holders and high and low pressure piping for each bay are also mounted on the walls. Attached to the top of the walls are beams which provide necessary structural reinforcement at the top of each wall. Mounted from the beams are booms, swivels, and hoses which provide the water to the customers, as well as the electrical lines and high pressure pipes.

For cosmetic purposes, the partnership installed a thin aluminum or galvanized tin (depending on the facility) cover on top of the beams. The cover, which is not watertight, is attached to the beams without seals and contains holes for pipes to gain access into the bays.

Beneath each bay are located two underground tanks for collecting and removing dirt and sediment from the water. Two tanks are apparently required to remove adequately sediments from the wastewater in order that the wastewater can, consistent with each local municipality's requirements, be discharged into the municipality's sewage system. Atop the settling tanks sit sloped, reinforced concrete slabs with grates which direct the wastewater into the tanks.

Each carwash facility has a single equipment room, the same size as a single bay. The equipment room contains the main pumps, electrical switching gear, water heaters, boilers, compressors, soap tanks, secondary circulating pumps, motors, mixing tanks, rinse tanks, controls, timers, water softeners, valves, circuit breakers, and electrical panels. The equipment rooms are used solely to house equipment and are not insulated or air-conditioned; minimal heating is provided, however, so as to heat the water and prevent

pipes from freezing during winter. The rooms have neither windows nor other ventilation. The carwash facilities have no rest rooms.

During the tax years 1984 through 1987, taxpayers[1] claimed investment tax credits based upon their investments in the carwashes[2] and depreciated some of the carwashes over a five year depreciation period under the Accelerated Cost Recovery System ("ACRS") elucidated in I.R.C. § 168. The Commissioner disallowed much of the claimed credit, required depreciation over a far longer period, and imposed negligence and overstatement penalties. After trial, the tax court upheld the Commissioner's action.

### II.

Taxpayers' carwashes were put into service in 1984, 1985 and 1986. Under the version of the Internal Revenue Code in effect during the years at issue,[3] I.R.C. § 38 allowed for taxpayers placing property in service which qualified as so-called 'section 38 property' to take an 'investment tax credit', as calculated under I.R.C. § 46.[4] The term 'section 38 property' was defined broadly in I.R.C. § 48(a)(1), in relevant part, as follows:

Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property (other than an air conditioning or heating unit), or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communica-

1. Because the general partners of Peninsula filed joint tax returns, their wives, Ruby Schrum, Jeanette Schrum and Judith Moore, are also parties to this action.

2. In fact, taxpayers did not claim an investment tax credit with respect to one of the carwash facilities that they had constructed.

3. Except as otherwise noted, all references to the Internal Revenue Code and to the Treasury Regulations promulgated thereunder are to the versions applicable during the years at issue.

4. I.R.C. § 49(a) (Supp. IV 1986), added by the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2166, provided that the investment tax credit at issue here would "not apply to any property placed in service after December 31, 1985." The Commissioner, for reason or reasons unknown, did not challenge the taxpayers' claims to credits even for property placed in service after December 31, 1985. Respondent's Br. 19 n. 5.

tions, electrical energy, gas, water, or sewage disposal services....

I.R.C. § 48(a)(1).

Taxpayers advance two arguments in support of their position that the carwash facilities are section 38 property. First, they assert that the facilities, or portions thereof, qualify as "tangible personal property" under section 48(a)(1)(A). Second, they argue that, even if that is not the case, the facilities, or parts thereof, are "other tangible property ... used as an integral part of ... water [and] sewage disposal services" under section 48(a)(1)(B)(i).

■ The IRS has set out the standards for application of section 48 in Treasury Regulation § 1.48–1. The IRS promulgated this regulation "pursuant to the express Congressional delegation of power of I.R.C. § 38(b). It is 'legislative in character and as binding upon a court as a statute....'" *A.C. Monk & Co. v. United States,* 686 F.2d 1058, 1060 n. 2 (4th Cir.1982) (quoting *Kramertown Co. v. Commissioner,* 488 F.2d 728, 730 (5th Cir. 1974)). This regulation, therefore, guides our analysis in this case.

Our analysis consists of two steps. We first address taxpayers' contention that the carwash facilities in their entirety qualify as section 38 property, under either subparagraph of I.R.C. § 48(a)(1). Concluding that not to be the case, we then consider whether the tax court properly upheld the Commissioner's determination that only certain portions of the facilities qualify as section 38 property.

A. *Consideration of whether the carwash facilities in their entirety qualify as section 38 property.*

1. *Whether taxpayers' facilities in their entirety qualify as section 38 property under section 48(a)(1)(A).*

■ We first determine whether taxpayers' facilities qualify as section 38 property

under section 48(a)(1)(A), which defines the class of "tangible personal property." Treasury Regulation § 1.48–1(c) guides our inquiry and provides, in pertinent part:

Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal".... [T]he term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings and other inherently permanent structures (including items which are structural components of such buildings or structures).... Tangible personal property includes all property (other than structural components) which is contained in or attached to a building.... Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

For purposes of our discussion here, we need only isolate one rule from the foregoing: "buildings and other inherently permanent structures" cannot qualify as "tangible personal property" unless they are property "in the nature of machinery." *See Weirick v. Commissioner,* 62 T.C. 446, 452–53, 1974 WL 2764 (1974).[5]

■ In accordance with these rules, we first examine the carwash structures to determine whether they are inherently permanent structures; we conclude that they are. This conclusion means that, if the carwash facilities in their entirety are to qualify as section 38 property, the carwash structures would have to be property "in the nature of machinery." Because we determine that they are not, we conclude that the facilities

---

5. The regulation indicates that "structural components of a building or other inherently permanent structure" cannot be "property in the nature of machinery" and, therefore, cannot qualify as "tangible personal property." *Accord Weirick,* 62 T.C. at 452 n. 7. We are not clear as to exactly what distinguishes a structural from a non-structural component of a building or inherently permanent structure. The case at bar does not require us to clarify our understanding because we conclude here that the carwash structures are inherently permanent and, on that basis, that they do not qualify as "property in the nature of machinery."

do not fall within the broad class of "tangible personal property."

### a. Whether the carwash structures are inherently permanent structures.

■ We first address the question of whether the carwash structures are "inherently permanent structures." We believe that the tax court here correctly applied the test for inherent permanency enunciated in *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. 664, 672–73, 1975 WL 3184 (1975). This test, adopted by the Seventh Circuit in *McManus v. United States*, 863 F.2d 491, 498 (7th Cir.1988), and the Eleventh Circuit in *Munford, Inc. v. Commissioner*, 849 F.2d 1398, 1405 n. 5 (11th Cir.1988), calls for examination of the property in question in light of the following six factors:

(1) Is the property capable of being moved and has it in fact been moved?

(2) Is the property designed or constructed to remain permanently in place?

(3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved?

(4) How substantial a job is removal of the property and how time-consuming is it?

(5) How much damage will the property sustain upon its removal?

(6) What is the manner of affixation of the property to the land?

*Munford, Inc.*, 849 F.2d at 1405 n. 5 (citing *Whiteco Indus., Inc.*, 65 T.C. at 672–73). Applying this analysis to the case at bar, we

have little trouble concluding, as did the tax court, that taxpayers have failed to meet their burden of proof that the facilities are not "inherently permanent structures." · The structures include concrete foundations and brick walls. They are therefore designed and constructed with an eye toward permanence. Further, taxpayers do not contend that the facilities are readily movable, nor do they suggest that removal of the facilities could be accomplished without sustaining substantial damage.

Taxpayers urge that, in determining whether a structure is inherently permanent, we should consider the 'economic permanence' of the structure, i.e., the adaptability of the structure to other uses. Taxpayers suggest that their carwash facilities are 'single-purpose' structures which must be destroyed if the land underlying them is to be used for virtually any other purpose. Noting that the test we adopted in *A.C. Monk & Co.*, *supra*, 686 F.2d at 1060–61, for determining whether a structure is a "building" for section 38 purposes includes as a factor the economic permanence of the structure in question,[6] taxpayers argue that, because the regulation speaks of "buildings and *other* inherently permanent structures," Treas. Reg. § 1.48–1(c) (emphasis added), a similar inquiry is appropriate in determining whether a structure is inherently permanent.

■ We are not persuaded. First, we read the language, "buildings and other inherently permanent structures," to mean only that the class of "inherently permanent structures" encompasses the class of "buildings," i.e., if a structure is a "building," it is also an "inherently permanent structure."

---

**6.** In *A.C. Monk & Co.*, *supra*, we adopted a three-prong test for determining whether a structure is a "building." Such an inquiry, we held, turns on the physical appearance of the structure, i.e., whether it "resembles" a building; the function of the structure, i.e., whether the structure is intended to provide shelter for working, office, parking, display or sales space; and the adaptability of the structure, i.e., whether the structure is readily adaptable to uses other than its current use. 686 F.2d at 1060–61.

The government contends that the adaptability prong of the *A.C. Monk & Co.* test applies in determining whether a structure is a "building" only for purposes of section 48(a)(1)(B), and not

for purposes of section 48(a)(1)(A). It grounds this argument upon the fact that the adaptability prong has its origin in language in Treasury Regulation § 1.48–1(e) to the effect that "building" "does not include ... a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so clearly related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced." We need not, and do not, rule upon the validity of this argument here; we assume, in the text, that the adaptability prong applies in determining whether a structure is a "building" under both subparagraphs.

The converse, however, is not true in all cases. Thus, the language of the regulation does not convince us that a factor relevant in determining whether a structure is a "building" will also be relevant in determining whether a structure is "inherently permanent." Moreover, we think that including 'economic permanence' as a factor in determining whether a structure is "inherently permanent" would be a meritless exercise for, upon reflection, it is readily seen that virtually no structure which is not a building will be readily convertible into some other form in which it will be amenable to other uses.

We affirm the tax court's conclusion that the structures are inherently permanent. Consequently, we need not reach the question, also not decided by the tax court, of whether taxpayers' facilities are "buildings."

b. *Whether taxpayers' facilities are property in the nature of machinery.*

■ Even an inherently permanent structure can qualify as "tangible personal property" so long as it is "property in the nature of machinery." *See* Treas. Reg. § 1.48–1(c). Taxpayers urge that the carwash facilities are "property in the nature of machinery." In making this argument, they rely heavily upon the tax court's opinion in *Weirick v. Commissioner,* 62 T.C. 446, 1974 WL 2764 (1974). There the court reasoned that, where some of the property under examination is machinery, and other property is both inherently permanent yet also effectively in-

separable from the machinery, the property is to be viewed unitarily. Under such a circumstance, all the property, viewed unitarily, although inherently permanent to at least some extent, will qualify as property in the nature of machinery. *Id.* at 453–54. In *Weirick,* the tax court concluded that intermediate line towers supporting a ski lift could not be viewed separately from the sheave assemblies, installed on each line tower, which supported or held down the line cable and which concededly qualified as machinery. In support of this conclusion, the tax court noted that the designers had envisioned and designed the line towers and sheave assemblies as a single device; that, economically, were it to become necessary to replace a sheave assembly, it would be prudent to simply replace the entire line tower and sheave assembly as one; and that, from a functional standpoint, neither the line towers nor the sheave assemblies alone could perform the purpose, of supporting or holding down the cables to which moving chairs are attached, for which the entire apparatus had been designed. *Id.* at 454.[7]

Taxpayers urge that their carwash facilities should similarly be viewed unitarily and deemed to be property in the nature of machinery. They conceive of the facilities as "nothing more than . . . automatic vending machine[s] that sell[ ] water and collect[ ] and process[ ] the sewer water." Appellants' Br. 23.[8] We reject this notion.

The tax court determined that the portion of *Weirick* upon which taxpayers rely is fac-

---

7. We have some misgivings about the validity of the tax court's application of the controlling regulation in *Weirick.* In particular, as we explain above, *see supra* note 5, the language of the regulation indicates that "structural components of a building or other inherently permanent structure" cannot be "property in the nature of machinery." We are concerned that the tax court's suggestion in *Weirick* that an inherently permanent structure, which otherwise will not qualify as "tangible personal property," can be viewed unitarily with other property and thereby qualify as "property in the nature of machinery" allows for "structural component[s] of a[n] . . . inherently permanent structure" to qualify, in apparent violation of the regulation, as "property in the nature of machinery." Even assuming *Weirick* to be correctly decided, however, the inherently permanent structures in the case at bar are, as we conclude below, not "property in

the nature of machinery." We therefore need not address *Weirick*'s validity here.

8. *Weirick* does not require that an entire facility qualify as one "machine" in order for some component part of the facility to qualify "property in the nature of machinery." Rather, *Weirick* envisions examining each component part to determine whether it is appropriately viewed with the equipment components of the facility and therefore "property in the nature of machinery." *See Munford, Inc.,* 849 F.2d at 1406. The taxpayers here, in framing their argument based upon *Weirick,* do not separate the carwash facilities into their component structural elements. In any event, our analysis below of the inapplicability of the rule in *Weirick* to the facilities, taken as wholes, applies equally to each of the facilities' structural elements.

tually distinguishable from the facts presented in the case at bar. The court reasoned that, here, there is no showing that the carwash "machinery" was designed as, or is envisioned as, part of a single unit including the supporting structure. Nor is there any showing that, were the carwash "machinery" to be replaced, it would be economical to replace at the same time the entire structure. Nor is there any showing that the carwash "machinery" cannot function as it was designed to function absent the supporting structure. The tax court concluded that, consequently, there was no basis for viewing the carwash structures as one with the carwash "machinery" and that, therefore, the facilities could not be viewed unitarily as "property in the nature of machinery."

We agree with the tax court's reasoning. The facts in the present case more closely align themselves with those addressed in another portion of the *Weirick* opinion. There the tax court found that ramps used to allow skiers to access the skilift were not properly viewed as one with the skilift mechanism: the skilift worked the same way with or without the ramps even though, without the ramps, no skiers could in fact make use of the skilift. 62 T.C. at 455.

The facts in the instant case also parallel, as the court below found, the facts presented in *Munford, Inc. v. Commissioner*, 87 T.C. 463, 1986 WL 22010 (1986), *aff'd*, 849 F.2d 1398 (11th Cir.1988). There it was found that the structural components of a structure the interior of which was completely refrigerated were not properly viewed unitarily with the refrigeration equipment so as to constitute property in the nature of machinery. The tax court, 87 T.C. at 492–93, and the court of appeals, 849 F.2d at 1406–07, both distinguished the line towers in *Weirick* from the property there under consideration in much the same way that we do in this case. *Munford*, then, further buttresses our conclusion.

For these reasons, we agree with the tax court that taxpayers' facilities are not, taken as wholes, "property in the nature of machinery," *accord* Rev.Rul. 79–406, 1979–2 C.B. 18, 19.[9] In light of the foregoing, then, the facilities do not, wholly, qualify as section 38 property under section 48(a)(1)(A). Still to be determined is whether the facilities qualify as section 38 property under section 48(a)(1)(B).

2. *Whether taxpayers' facilities in their entirety qualify as section 38 property under section 48(a)(1)(B)(i).*

■ To reiterate, section 48(a)(1)(B)(i) includes all tangible property, with the exception of buildings and structural components thereof, that "is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services" under the section 38 umbrella. As relevant here, Treasury Regulation § 1.48–1(d) instructs: "[A]ny ... tangible property (but not including a building and its structural components) used ... as an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service ... may qualify as section 38 property." Treas. Reg. § 1.148–1(d)(1). This statement allows us to isolate the five essential elements which a piece of property must meet for it to come under the section 38 umbrella by means of section 48(a)(1)(B)(i): the property must be (1) tangible property, (2) other than a building or its structural components, which (3) is used as an integral part (4) of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services (5) by a person engaged in a trade or business of furnishing any such service.

■ The carwash structures clearly meet the first prong of this test and we will assume, for purposes of discussion, that the taxpayers' facilities are not buildings. Taxpayers contend that the carwash facilities furnish water and sewage disposal service,

---

9. Revenue Ruling 79–406 holds that a self-service carwash structure is a "building" for section 38 purposes. We cite the revenue ruling not for that broad proposition, but only for the limited proposition that the carwash structure "is not an item of machinery or equipment." 1979–2 C.B. at 19.

that taxpayers are in the business of furnishing water and sewage disposal services, and that the carwash facilities are integral parts of furnishing such services. We may assume, for purposes of discussion, that taxpayers, in fact, furnish water and sewage disposal services,[10] for we conclude that taxpayers' facilities, taken as wholes, nevertheless fail to qualify as section 38 property under section 48(a)(1)(B).

We turn first to taxpayers' contention that they are in the business of furnishing sewage disposal services.

> [I]t is ... clear that Congress did not intend that every service performed by a taxpayer would constitute a separate trade or business for the purpose of investment tax credit computations. Thus, in determining the nature of the trade or business in which a taxpayer is engaged for purposes of the investment tax credit, we must distinguish between a taxpayer's "real" or primary business and activities that are merely incidental to or supportive of the operations of that primary business.

*Hub City Foods, Inc. v. Commissioner,* 884 F.2d 320, 324–25 (7th Cir.1989) (citations omitted).

We easily conclude that disposal of wastewater is incidental to Peninsula's primary business of providing self-service carwash facilities. Customers come to a self-service carwash to wash their cars. To accomplish this goal, all that is needed is water, soap, and various items of cleaning equipment. While taxpayers may be obligated to ensure that certain sediments are removed from the resulting wastewater before they can dispose of it in the various municipal sewage systems, customers do not patronize the taxpayers' facilities for this "service." *Cf. Mt. Mansfield Co. v. Commissioner,* 50 T.C. 798, 1968 WL 1527 (1968) (operators of ski resort are not in business of "furnishing transportation ... services" merely because they provide a skilift to transport patrons up the mountain), *aff'd per curiam,* 409 F.2d 845 (2d Cir.1969); *Evans v. Commissioner,* 48 T.C. 704, 1967 WL 1300 (1967) (provision of water, electricity and gas is incidental to primary business of operating motor home park), *aff'd per curiam,* 413 F.2d 1047 (9th Cir.1969). Consequently, taxpayers are not in the business of furnishing sewage disposal services.

Taxpayers' only remaining argument in favor of classifying the carwash facilities as section 38 property under section 48(a)(1)(B) is that they are in the business of furnishing water services, and that the facilities are an integral part of furnishing such services. Even assuming that taxpayers, in fact, furnish water services, *i.e.,* furnishing pressur-

---

**10.** The tax court interpreted the phrasing "furnishing ... water ... or sewage disposal services" narrowly, to refer only to the provision of utility services. We are not persuaded that such an interpretation accurately fulfills Congress' intent that "[t]he ... businesses of furnishing ... 'water,' or 'sewage disposal' services are to be given their commonly accepted meaning." S.Rep. No. 1881, 87th Cong., 2d Sess., *reprinted in* 1962 U.S.C.C.A.N. 3304, 3456.

We would note that the tax court's reliance upon *Evans v. Commissioner,* 48 T.C. 704, 1967 WL 1300 (1967), *aff'd,* 413 F.2d 1047 (9th Cir. 1969) (*per curiam* ), and *Westroads, Inc. v. Commissioner,* 69 T.C. 682, 1978 WL 3412 (1978), was misplaced. In *Evans,* the whole tax court was called upon to address a case where the owner of a motor home park installed equipment used only to distribute water, electricity and gas purchased from utilities to residents of a motor home park. While the tax court did deny the investment tax credit for the equipment, it did not do so on the ground that equipment was used merely for distribution purposes, as suggested by the court below here, but on the ground that the taxpayer's primary business was not provision of water, electricity and gas, but running a motor home park. Indeed, a separate concurrence specifically criticized the majority opinion on this issue.

In *Westroads, Inc.,* a shopping center owner installed electrical equipment to produce and sell electrical power to shopping center tenants. The tax court held that the owner was entitled to the investment tax credit, reasoning that the shopping center owner did not merely purchase electricity from the electric utility and distribute it to tenants, but actually produced electricity which it then sold to tenants. The tax court's decision in *Westroads, Inc.* does not seem, however, to have established generation of electricity as a prerequisite to the investment tax credit. It seems, rather, to have left open the question of whether something more than mere distribution, but less than actual generation, might constitute "furnishing ... electrical energy ... services...."

Our reasoning in this case, of course, allows us to leave the proper interpretation of the language "furnishing ... water ... or sewage disposal services" to another day.

ized water, *see supra* note 10, and that they are in the business of furnishing such services, however, we cannot conclude that the facilities are an integral part of furnishing such services.

Treasury Regulation § 1.48–1(d)(4) explains: "Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity." It is clear that the carwash structures are neither "used directly" in furnishing water services nor "essential to the completeness" of furnishing a water service. The dispensation of pressurized water, which we have assumed to qualify as "furnishing ... water ... services," is accomplished completely by the carwash equipment and the plumbing and electrical systems, independent of the presence of the structures.

Thus, taxpayers' carwash structures do not qualify, wholly, as section 38 property under section 48(a)(1)(B). Therefore, and in light of our earlier conclusion that the facilities also do not qualify, wholly, under section 48(a)(1)(A), we must conclude that the carwash facilities, as wholes, do not qualify as section 38 property. Rather, as the Commissioner and the tax court found, only some portion of taxpayers' property qualifies as section 38 property.

B. *Determination of what portions of the carwash facilities qualify as section 38 property.*

Taxpayers contend that, even if the carwash facilities are not, in their entirety, section 38 property, various components of the carwash facilities are. For the carwashes constructed by Peninsula, the Commissioner allocated some of the taxpayers' construction costs to the category of carwash equipment, in accordance with the recommendation of an auditor who visited one of these carwashes. Under this allocation, the full cost of some components of the facilities were allocated, in their entirety, as carwash equipment. In addition, 50% of the labor cost, 60% of the cost of the plumbing system, and 50% of the cost of the electrical system was allocated as carwash equipment. The remaining costs were allocated to the carwash structures. For the facilities purchased by Peninsula, the Commissioner allocated costs to structure and equipment in accordance with the allocations contained in an invoice prepared by the seller. The tax court held that the taxpayers "failed to prove that they are entitled to a credit greater than that determined by [the Commissioner], as they have failed to introduce sufficient evidence to prove the amount and nature of such expenditures, ... or that such expenditures are for tangible property which qualifies for an investment credit." *Schrum v. Commissioner*, 1993 T.C.M. (RIA) ¶ 93,124, at 550, 1993 WL 91293 (Mar. 30, 1993) (citation omitted). As a consequence, it upheld the allocations adopted by the Commissioner.

Any allocation of costs to equipment must be justified under either section 48(a)(1)(A) or section 48(a)(1)(B). We consider first whether some portion of the facilities qualifies as section 38 property under section 48(a)(1)(A). Under section 48(a)(1)(A), any tangible personal property, which includes any nonstructural property classifiable as equipment, qualifies as section 38 property. It is clear that some portion of taxpayers' facilities falls within this class of property. Our only duty, then, is to examine the propriety of the allocation adopted by the tax court.

█ We consider first the carwashes constructed by Peninsula, and focus on the 60% of plumbing expenses and 50% of electrical expenses which the Commissioner allocated to carwash equipment. This allocation must be examined in light of our decision in *A.C. Monk & Co., supra.* There, addressing the question of whether and when an electrical system is a structural component of a building as opposed to section 38 property under section 48(a)(1)(B), we stated:

[W]e find no justification for allocating a portion of a single system as structural. The regulations never speak of such an allocation, and it seems difficult to conceive of a single bus duct, transformer, or piece of wiring being both a structural component and other property ....

686 F.2d at 1065 (footnote omitted).[11]

The allocation of expenses adopted by the Commissioner and endorsed by the tax court necessarily assigns portions of the various components of the carwash facilities to the carwash structures; these structures, as determined above, are inherently permanent in nature. We see no reason why our proscription against allocating an electrical system in part to a building would not extend to barring allocations which assign portions of various systems to inherently permanent structures.[12] As a consequence, the Commissioner's allocation runs afoul of our circuit precedent.[13]

The Commissioner does not appeal the tax court's determination in this regard; effectively, then, she concedes that the electrical and plumbing components of taxpayers' facilities described above are properly allocated, at least in part, as section 38 property. In light of this concession and our holding that such components are either, in their entirety, structural or not, we vacate the tax court's determination in this regard. On remand, the tax court should allocate the components in question entirely as non-structural. The

court should also re-examine the allocation of labor costs incurred by Peninsula in the construction of the carwashes to see if such allocations need to be disturbed in light of our holding herein.[14]

With respect to the carwashes purchased intact by Peninsula, the Commissioner's allocation, based upon the invoice prepared by the seller, assigns percentages of cost to structures and to equipment without further elucidation. As a consequence, we cannot verify that such allocation is consistent with *A.C. Monk & Co.* The tax court, on remand, should examine this allocation in light of our holdings in *A.C. Monk & Co.* and herein.

We turn to whether any greater portion of the facilities might qualify as section 38 property under section 48(a)(1)(B).[15] In light of our conclusion above that taxpayers are not engaged in the business of furnishing sewage disposal services, any portion of the facilities can qualify as section 38 property under section 48(a)(1)(B) only to the extent that the taxpayers furnish water services, that taxpayers are in the business of providing such services, and that the property in question is integral to the provision of such services and

11. We proceeded to elucidate a test for determining whether an electrical system is a structural component of a building:

> We believe that the proper approach is ... to determine whether the system has more general uses than simply operating specific items of machinery. Thus, if the wiring and other components of the electrical system could be adapted to other operations, they are structural components of the building....

> One method of analyzing the issue would be to determine whether a manufacturer converting the building to an alternative process would be able, with reasonable alterations, to use the existing system, or whether he would have essentially to scrap the system and install another.

686 F.2d at 1065–66. Because our holding does not necessitate evaluating a proper allocation in the case now before us, we need not determine how the *A.C. Monk & Co.* test, developed for use in determining when an electrical system is a structural component of a building, would translate to a test to determine when such a system is a structural component of an inherently permanent structure.

12. If, in fact, taxpayers' structures are "buildings," and if taxpayers, in fact, furnish water

services, our holding in *A.C. Monk & Co.* is directly applicable. *See post* at 436.

13. We acknowledge that our holding in *A.C. Monk & Co.* as to allocation of component systems has met with some disagreement in our sister circuits. *See Morrison, Inc. v. Commissioner,* 891 F.2d 857, 863 (11th Cir.1990) ("we accept ... that taxpayers can claim investment tax credit [for electrical systems] on a percentage basis ... and reject the reasoning in *Monk* "); *Illinois Cereal Mills, Inc. v. Commissioner,* 789 F.2d 1234, 1242 (7th Cir.) (questioning our holding in *A.C. Monk & Co.*), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986). We, of course, are bound by our circuit precedent.

14. We do not mean to imply that labor costs cannot be allocated in part to a structure and in part to equipment consistent with our holding in *A.C. Monk & Co.* We simply mean that, to the extent that the allocation of labor costs was based upon the erroneous allocation of plumbing and electrical expenses, the labor cost allocation must be adjusted.

15. Because the tax court concluded that taxpayers furnished neither water nor sewage disposal services, it found that no portion of the facilities could qualify as section 38 property under section 48(a)(1)(B).

is not a structural component of a building. Of all the components of the carwash facilities, at most, only the plumbing and electrical equipment might meet all these qualifications. Because, as we conclude above, the plumbing and electrical equipment qualify as section 38 property under section 48(a)(1)(A), we need not further address the potential for qualification under section 48(a)(1)(B).

Except as discussed above, we find no merit in taxpayers' challenge to the allocation of costs adopted by the tax court. In accordance with the foregoing, we affirm in part and vacate in part the tax court's holding as to the allocation of taxpayers' property for investment tax credit purposes, and remand for further proceedings.

### III.

██ Taxpayers claim to have been entitled to depreciate the carwash facilities over a five-year recovery period. *See* I.R.C. §§ 167, 168(a), (c)(1); *see generally Collins Music Co. v. United States,* 21 F.3d 1330, 1331–32 (4th Cir.1994). Section 168(c)(2)(B) defines "5–year property" as "recovery property which is section 1245 class property and which is not 3–year property, 10–year property, or 15–year public utility property." The Commissioner contests only that the facilities are "section 1245 property."

The language used in I.R.C. § 1245(a)(3) to define section 1245 property is, as relevant here, virtually identical to the language used in section 48(a) to define section 38 property:

> "[S]ection 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 ... and is either—
>
> (A) personal property,
>
> (B) other property (not including a building or its structural components) but only if such other property is tangible and has an adjusted basis in which there are reflected adjustments described in paragraph (2) for a period in which such property (or other property)— |

(i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services....

I.R.C. § 1245(a)(3). That the classes of section 38 property and section 1245 property are, for present purposes, coextensive, is confirmed by Treasury Regulation § 1.1245–3(b)(1), which, in defining section 1245 property, makes several references to Treasury Regulation § 1.48–1(c).[16] Thus, taxpayers' property qualifies as section 1245 property exactly to the extent that it qualifies as section 38 property; to the extent that it does not qualify as section 38 property, it also does not qualify as section 1245 property and, therefore, cannot be depreciated over a five-year recovery period. Consistent with our discussion above, then, we affirm in part and vacate in part the tax court's determination in this regard, and remand for further proceedings.

### IV.

██ The Commissioner imposed an addition to tax against Dannie and Jeanette Schrum for negligence. Under I.R.C. § 6653(a)(1)(A), as applicable during the years at issue, if any part of an underpayment in a year is attributable to negligence, an addition was imposed on the entire underpayment for such year. *Commissioner v. Asphalt Products Co.,* 482 U.S. 117, 107 S.Ct. 2275, 96 L.Ed.2d 97 (1987). Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Antonides v. Commissioner,* 91 T.C. 686, 699, 1988 WL 98359 (1988), *aff'd,* 893 F.2d 656 (4th Cir.1990). The taxpayer bears the burden of proving incorrect the Commissioner's determination of negligent underpayment. *Bixby v. Commissioner,* 58 T.C. 757, 791–92, 1972 WL 2458 (1972).

The tax court noted that, although a taxpayer is not required to seek professional tax advice, such consultation can, in certain cases, demonstrate that the taxpayer acted

---

16. In particular, "personal property" is defined therein to include "tangible personal property" as defined in Treasury Regulation § 1.48–1(c). Treas. Reg. § 1.1245–3(b)(1).

reasonably. *See Hill v. Commissioner*, 63 T.C. 225, 251, 1974 WL 2660 (1974), *aff'd sub nom. Tenner v. Commissioner*, 551 F.2d 313 (9th Cir.1977) (unpublished disposition). The tax court stated that no evidence in the record indicated that Dannie and Jeanette Schrum had, in fact, consulted with tax professionals. The Schrums point to tax returns for the years in question which they submitted to the tax court. These returns, at least facially, support the Schrums' position. We therefore vacate the tax court's imposition of a negligence penalty and remand for further proceedings in this regard. Of course, to the extent that the tax court concludes that a negligence penalty remains appropriate, the amount of the penalty must be adjusted to reflect our holding as to taxpayers' primary tax liability.

## V.

The Commissioner determined an addition to tax under I.R.C. § 6661(a), as applicable, during the years at issue, for substantial understatement of tax liability against Dannie and Jeanette Schrum and against Jake and Ruby Schrum for certain tax years. This addition must be recalculated on remand to reflect our revision of the taxpayers' primary tax liability. We find no merit in the taxpayers' challenge to the general imposition of this addition.

## CONCLUSION

The judgment of the tax court is affirmed in part and vacated in part. The case is remanded to the tax court for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED.*