USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2104
No. 97-2105

 L.L. BEAN, INC., ET AL.,

 Petitioners, Appellants,

 v.

 COMMISSIONER OF INTERNAL REVENUE,

 Respondent, Appellee.

 APPEAL FROM A DECISION OF THE UNITED STATES TAX COURT

 [Hon. Robert P. Ruwe, Judge]
 

 Before

 Boudin, Circuit Judge,
 
 Coffin and Cyr, Senior Circuit Judges.
 
 

 Martin I. Eisenstein with whom Brann & Isaacson was on
consolidated brief for petitioners.
 Bridget M. Rowan, Tax Division, Department of Justice, with
whom Loretta C. Argrett, Assistant Attorney General, and Ann B.
Durney, Tax Division, Department of Justice, were on consolidated
brief for respondent.

May 28, 1998

 
 

 BOUDIN, Circuit Judge. L.L. Bean, Inc. appeals from an
adverse decision of the Tax Court. Although the decision covers
two different tax years (1986 and 1987), the central issue in both
years is the status of certain facilities under 26 U.S.C. 38,
48, which govern the investment tax credit. These provisions
provided certain tax advantages in the years in question, primarily
a tax credit, for qualifying facilities commonly known as "section
38 property." 
 The underlying facts are generally undisputed--many of
them stipulated--although how tax code definitions should be
applied to those facts is very much at issue. L.L. Bean is a well-
known supplier of apparel and sporting goods based in Freeport,
Maine. For its extensive catalogue business, the company keeps on
hand a large reserve inventory. In 1986, L.L. Bean placed in
service a storage facility, known as the reserve facility, and a
new shipping building, known as the 1986 shipping building.
 To the extent that these facilities or elements within
them qualify as so-called "section 38 property" under section 48 of
the Internal Revenue Code, L.L. Bean is entitled to a substantial
investment tax credit for qualifying investment. In addition,
section 38 property enjoys a shortened depreciation schedule, 26
U.S.C. 168(b)(1), and a deduction for interest accrued during the
construction period, id. 163. In the Tax Court, the parties
stipulated as to the tax consequences that would follow from a
finding that components were or were not section 38 property.
 The rub is that section 38 property is restricted to
certain categories of property that Congress meant to favor, and
the sole category invoked by L.L. Bean is that of "tangible
personal property (other than an air conditioning or heating
unit)." 26 U.S.C. 48(a)(1)(A). Further, the Treasury
regulations defining this statutory phrase make local law
irrelevant and provide in pertinent part:
 For purposes of this section, the term
 "tangible personal property" means any
 tangible property except land and improvements
 thereto, such as buildings or other inherently
 permanent structures (including items which
 are structural components of such buildings or
 structures). . . . Tangible personal property
 includes all property (other than structural
 components) which is contained in or attached
 to a building.

26 C.F.R. 1.48-1(c).
 The reserve facility at issue in this case is a large
storage facility designed to house L.L. Bean's merchandise in long
rows of floor-to-ceiling racks. It is about 500 feet long by 190
feet wide and its height is 52 feet. Instead of the standard
columns generally used to support the roof and walls in a free-
standing building, the structural support for the roof and three of
the walls of the reserve facility is the storage rack system
itself. The use of the rack system for this purpose was
deliberate, aimed at saving construction costs and increasing
storage space.
 The racks occupy about 80 percent of the ground floor of
the reserve facility, and a typical rack row has vertical columns
50 feet high, anchor-bolted to the floor and topped with horizontal
beams to support the roof deck. The shelves reach virtually to the
roof, and employees access them by using "transtackers," which move
along the aisles but then raise the operator and a load-bearing
platform vertically to the appropriate racks. The transtackers
draw power from a dedicated electrical system installed at the top
of each aisle, somewhat in the manner of an electric trolley.
 The reserve facility contains an oil-fired boiler to
provide heating. It has an electrical system that is integrated
into the rack system, being supported by the racks and other
structural elements in the facility. There is a water-based
sprinkler system, including sprinklers fixed to the roof and other
sprinklers at intermediate levels supported by the racks. 
 In the case of the 1986 shipping building, L.L. Bean
sought the tax credit solely for a storage facility, located within
the building, known as the "mezzanine system." The mezzanine
system, contemplated when the 1986 shipping building was designed,
uses cantilevered shelving attached to rack posts in order to hold
merchandise; these rack posts, together with steel frames in other
places, are used to support plywood decking which comprises the
mezzanine level. At the mezzanine level, further shelving units
and some office space and enclosed work areas sit on the plywood
deck. 
 The mezzanine system supports neither the ceiling nor the
walls of the shipping building, but it does support the mezzanine
floor, thereby reducing construction costs and increasing storage
space. Various other elements are connected to, or suspended from
the underside of, the mezzanine system, including cable,
electricity and communications, lighting fixtures and sprinkler
piping. The mezzanine floor is the first stop for freight
elevators located in the center of the building. 
 In the tax returns that led to the present litigation,
L.L. Bean originally claimed an investment tax credit for the
entire reserve facility, as well as the accelerated depreciation
and interest expense deduction already described. All of these
claims depended on the classification of the reserve facility as
section 38 property. The Commissioner disallowed over 80 percent
of the claimed tax credit. L.L. Bean also claimed an investment
tax credit for the mezzanine system. The Commissioner allowed an
investment tax credit for about two-thirds of the amount claimed.
 L.L. Bean then filed suit in the Tax Court to dispute the
Commissioner's adjustments. A trial was conducted in October 1995, 
many of the facts being stipulated. Ultimately, the Tax Court
wrote a lengthy opinion, containing a very detailed description of
the property in question, which rejected L.L. Bean's claims. L.L.
Bean, Inc. v. Commissioner, T.C. Memo 1997-175, 73 T.C.M. (CCH)
2560 (1997). L.L. Bean's appeal to this court followed.
 On appeal, L.L. Bean argues that even if the reserve
facility is not section 38 property, the rack system so qualifies. 
The Tax Court saw the rack system as having a dual purpose "to hold
[the taxpayer's] merchandise and to support the roof and walls that
protect the merchandise." Because the rack system provided
essential structural support for the walls and roof, the court held
that it was a "structural component[]" of a "building[] or other
inherently permanent structure[]" and was therefore not tangible
personal property. 26 C.F.R. 1.48-1(c).
 L.L. Bean does not dispute the Tax Court's bare factual
findings that the rack system is permanent and plays a structural
role in supporting the roof and walls. Instead, L.L. Bean argues--
as propositions of law subject to de novo review--that the racks
are tangible personal property under an explicit Treasury
regulation; that a "primary function test" should be used and, if
used, would qualify the rack system as tangible personal property;
and that the Tax Court erred in applying a supposed "more than
incidental" structural function test to deny the credit.
 It is quite true that the Treasury regulations give as
examples of items qualifying for the section 38 credit (as tangible
personal property) "such property as production machinery, printing
presses, transportation and office equipment [and] . . . display
racks and shelves . . . contained in or attached to a building . .
. ." 26 C.F.R. 1.48-1(c). Obviously, the credit is available
for such items where, as is ordinarily true, they play no
structural role in the building. Whether this is so when "such
property" is part of the "structural components" of a building is
another matter.
 Nothing in the regulations, or the statute, indicates
that the drafters gave much thought about how to treat items that
play a dual role as structural components and in functions that, if
performed separately, would render them tangible personal property. 
Arguably, the regulation language favors the IRS since it excludes
from credit any items that are "structural components," and it then
says that "[t]angible personal property includes all property
(other than structural components) which is contained in or
attached to a building," giving racks and shelves as examples. Id.(emphasis added).
 On the other hand, it is not easy to imagine that
Congress would have wanted a tax credit to be withheld if a hugely
expensive printing press were used to help prop up a wall that
could as easily be propped up by a 2 by 4 board. Thus, while we
readily reject L.L. Bean's "plain language" (but out of context)
reading of the regulation's examples, we find of somewhat more
interest L.L. Bean's suggestion that where an item both is a
structural component and plays a role that would result in the 
credit if performed by a separate item, the test should be the
primary purpose. L.L. Bean points to other areas of the code where
primary purpose tests have been adopted. E.g., 26 U.S.C. 
165(c)(2) (governing certain losses from transactions); see Deweesv. Commissioner, 870 F.2d 21, 33 (1st Cir. 1989). 
 Yet, it is not clear why L.L. Bean's rack system would
qualify for the credit even if this test were adopted. To be sure,
a building without the rack system (or some substitute storage
arrangements) would not serve L.L. Bean's intended purpose; but
since the building would collapse without the rack system, it is
pretty hard to describe the roof- and wall-support attributes of
the present rack system as secondary. The Tax Court had it right
in describing the primary purpose of the rack system as bothsupport and storage.
 L.L. Bean's last general attack on the lower-court
opinion is its claim that the Tax Court misconstrued two earlier
revenue rulings in adopting a test that an item did not qualify for
a credit if its structural role was "more than incidental." Rev.
Rul. 79-183, 1979-1 C.B. 44; Rev. Rul. 79-181, 1979-1 C.B. 41. 
Although the revenue rulings used this phrase, both rulings could
easily be distinguished as essentially decisions on particular
facts rather than as establishing any general rule of the kind that
L.L. Bean attributes to the Tax Court.
 However, the rack system in this case has as a central
function the support of the roof and walls of the building, and the
Tax Court's outcome is not dependent on whether a "more than
incidental" test is used. If L.L. Bean wanted to show that the
result in this case should be different, it needed to supply a
persuasive basis to show why its rack system--playing a substantial
and critical role in the support of the building--is not a
structural component or otherwise deserved some form of credit,
see, e.g., Tax Ct. R. 142(a); Uecker v. Commissioner, 81 T.C. 983
(1983). This L.L. Bean has failed to do.
 We turn now to the mezzanine system, for which a full
credit was not allowed (no explanation is provided by the parties
for the partial credit but perhaps some of the elements are
separable). As noted, the system does not itself support the walls
or ceiling of the 1986 shipping building, but it clearly performs
a structural function--primarily that of providing and supporting
the mezzanine floor of the building. To the extent that the system
is a dual-purpose structure, our prior discussion governs. But
that is not the argument L.L. Bean primarily relies on here.
 L.L. Bean's main argument on appeal is that the mezzanine
system as a whole is only a temporary structure, which could be
removed at any time, an argument springing from the Treasury
Regulations' reference to "inherently permanent structures," 26
C.F.R. 1.48-1(c). Some case law suggests that elements otherwise
structural may not fall in that category if they are designed to be
easily removable and temporary. Obviously, a grey area must exist
between property that is easy to remove and temporary, and property
that is inherently a permanent part of the building structure.
 It is the frequent business of courts to draw lines in
such grey areas. For example, the Eighth Circuit in Minot found
certain moveable partitions to be sufficiently temporary to qualify
as tangible personal property, 435 F.2d at 1372, while in a later
case finding certain non-load-bearing walls to be sufficiently
permanent to be classified as structural components, see 
Mallinckrodt, Inc. v. Commissioner, 778 F.2d 402, 403 (8th Cir.
1985) (noting that the walls (or partitions) were not easily
removed, and if removed at all would sustain substantial damage).
 The Tax Court weighed the various factors set forth in
the case law and determined that the mezzanine system was not
sufficiently removable and temporary to be tangible personal
property. The court noted that by L.L. Bean's estimate it would
take six to eight workers a little over a month to remove the
system--but that this estimate did not include the time necessary
to disconnect the electrical wiring, communication cables,
sprinkler systems, and duct work connected to it. 73 T.C.M. at
2573. This is a far cry from removable partitions that could be
packed up and carried off in a day, and we sustain the Tax Court's
ruling.
 L.L. Bean's remaining arguments concern not the rack
system or the mezzanine system as an entity but rather individual
related components for which it independently claims the credit. 
L.L. Bean first argues that the concrete slab forming the floor
supporting the rack system is essentially an item of machinery or
equipment. It relies on a case in which the Tax Court had
previously held a specially designed and reinforced concrete floor
to be tangible personal property. Texas Instruments, Inc. v.
Commissioner, T.C. Memo 1992-306, 63 T.C.M. (CCH) 3070, 3073-13
(1992).
 Ordinarily, a floor is part of the structure of a
building and not entitled to the credit. In Texas Instruments, the
court deemed the floor--because of its special construction--to be
an essential part of the machinery it supported, but a key fact was
that the supported element was machinery and not itself part of the
building. Here, we have already rejected the argument that the
rack system is a piece of machinery entitled to the credit. And
appellants do not claim that the reinforced floor was needed to
support the transtackers.
 The next disputed component is the reserve facility's
sprinkler system. Treasury Regulation 1.48-1(e)(2) specifies
that sprinkler systems are structural components of a building. 
L.L. Bean's argument that its reserve facility sprinkler system is
not a structural component rests on the grounds that the sprinkler
system is attached to the racks, not the building itself, and that
the system protects not the building but the inventory on the
racks.
 We do not think the location of the sprinklers is
controlling. As for the argument that the sprinklers protect the
contents of the building rather than the building itself,
sprinklers ordinarily protect both. Treasury Regulation 1.48-
1(e)(2) does provide an exception for components like heating and
air conditioning systems--ordinarily part of the building--where
"the sole justification" is to meet requirements of machinery or
particular materials within the building (e.g., a special cooling
system for frozen food). But there is no proof that this sprinkler
system serves so narrow a function.
 L.L. Bean does invoke the exception just cited for a
different component, saying that the sole justification of the
reserve facility's heating system is to heat the machinery of the
sprinkler system, and that it therefore passes the test of Treasury
Regulation 1.48-1(e)(2). The Tax Court held that L.L. Bean had
presented insufficient evidence that the heating system provides
for the comfort of employees no more than marginally and that in
any case, the sprinkler system was itself a structural component,
not the sort of "other machinery" contemplated in the regulation. 
We agree.
 Finally, L.L. Bean argues that 75 percent of the cost of
the building's electrical system should be deemed tangible personal
property as essentially dedicated to the transtackers. To this end
it cites three cases that allocated electrical systems costs to the
investment tax credit in proportion to the percentage of the
electrical load that powered certain machines: Morrison, Inc. v.
Commissioner, 891 F.2d 857, 863 (11th Cir. 1990); Illinois Cereal
Mills, Inc. v. Commissioner, 789 F.2d 1234, 1242 (7th Cir. 1986);
and Scott Paper Co. v. Commissioner, 74 T.C. 137, 185-86 (1980).
 The Fourth Circuit has forcefully rejected this approach. 
A. C. Monk & Co. v. United States, 686 F.2d 1058, 1065 (4th Cir.
1982); see also Schrum v. Commissioner, 33 F.3d 426, 435-36 & nn.11
& 13 (4th Cir. 1994). The allocation regime adopted by the Seventh
and Eleventh Circuits may be in some tension with the "sole
justification" approach adopted in the regulations for air
conditioning or heating equipment discussed above. This circuit
has not decided the issue, nor need we do so here.
 The Seventh and Eleventh Circuits' formula is not the
allocation approach that L.L. Bean urges us to adopt for this case,
despite L.L. Bean's citation of the cases and some ambiguous
language in its brief. The company apparently introduced no
evidence as to the proportion of electricity used by the
transtackers. Nor did it claim that 75 percent of the electrical
system, measured by cost, comprised separate components used only
to power the transtackers and so (arguably) were part of the
machinery that they powered. See A.C. Monk, 68 F.2d at 1065-66.
 Instead, the company declared in the Tax Court, and
repeats here, that 75 percent of the cost of the electrical system
is "attributable to" the transtackers. When we looked back into
the evidence for the source of the 75 percent figure, it turned out
that this figure is plucked from a chart appended to the report of 
one of L.L. Bean's expert witnesses. The only further information
contained in the report is that "[t]he electrical costs were
allocated based upon discussions with professional engineers to
reflect the functions which the equipment and electrical system
serves."
 The Tax Court was apparently prepared to consider a
credit based on relative use (in line with Seventh and Eleventh
Circuit decisions) but found that the evidence did not prove that
75 percent of the electricity was used by the transtackers. We
agree with this assessment of the evidence, given the lack of
clarity in the report and the absence of any testimony to explain
the figure. See State Police Ass'n of Mass. v. Commissioner, 125
F.3d 1, 5 (1st Cir. 1997) (review of Tax Court findings only for 
clear error). Thus we have no occasion to choose between circuits
on the question whether such an allocation-by-percentage-of-
electrical-use approach is proper.
 We have addressed the tax issues presented largely in a
mechanical fashion because there is no other choice. Congress was
clear about its overall purpose to encourage certain classes of
investment. But the statutory lines it drew--in separating favored
from ordinary investments--were in some measure artificial,
reflecting political choices and arbitrary cut-off points as well
as economic aims. Given the gloss of the Treasury regulations, the
Tax Court fairly applied the statute as it was written.
 Affirmed.