**L.L. BEAN, INC., et al., Petitioners, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee.**

**Nos. 97–2104, 97–2105.**

United States Court of Appeals, First Circuit.

Heard March 4, 1998.

Decided May 28, 1998.

Martin I. Eisenstein with whom Brann & Isaacson was on consolidated brief, for petitioners.

Bridget M. Rowan, Tax Division, Department of Justice, with whom Loretta C. Argrett, Assistant Attorney General, and Ann B. Durney, Tax Division, Department of Justice, were on consolidated brief for respondent.

Before BOUDIN, Circuit Judge, COFFIN and CYR, Senior Circuit Judges.

BOUDIN, Circuit Judge.

L.L. Bean, Inc. appeals from an adverse decision of the Tax Court. Although the decision covers two different tax years (1986 and 1987), the central issue in both years is the status of certain facilities under 26 U.S.C. §§ 38, 48, which govern the investment tax credit. These provisions provided certain tax advantages in the years in question, primarily a tax credit, for qualifying facilities commonly known as "section 38 property."

The underlying facts are generally undisputed—many of them stipulated—although how tax code definitions should be applied to those facts is very much at issue. L.L. Bean is a well-known supplier of apparel and sporting goods based in Freeport, Maine. For its extensive catalogue business, the company keeps on hand a large reserve inventory. In 1986, L.L. Bean placed in service a storage facility, known as the reserve facility, and a new shipping building, known as the 1986 shipping building.

To the extent that these facilities or elements within them qualify as so-called "section 38 property" under section 48 of the Internal Revenue Code, L.L. Bean is entitled to a substantial investment tax credit for qualifying investment. In addition, section 38 property enjoys a shortened depreciation schedule, 26 U.S.C. § 168(b)(1), and a deduction for interest accrued during the construction period, id. § 163.[1] In the Tax Court, the parties stipulated as to the tax consequences that would follow from a finding that components were or were not section 38 property.

The rub is that section 38 property is restricted to certain categories of property

---

1. The investment tax credit was repealed by the Tax Reform Act of 1986, Pub.L. 99–514, § 211(a), 100 Stat. 2085, 2166; but transition rules exist for property placed in service after December 31, 1985.

that Congress meant to favor, and the sole category invoked by L.L. Bean is that of "tangible personal property (other than an air conditioning or heating unit)." 26 U.S.C. § 48(a)(1)(A). Further, the Treasury regulations defining this statutory phrase make local law irrelevant and provide in pertinent part:

> For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures).... Tangible personal property includes all property (other than structural components) which is contained in or attached to a building.

26 C.F.R. § 1.48–1(c).

The reserve facility at issue in this case is a large storage facility designed to house L.L. Bean's merchandise in long rows of floor-to-ceiling racks. It is about 500 feet long by 190 feet wide and its height is 52 feet. Instead of the standard columns generally used to support the roof and walls in a free-standing building, the structural support for the roof and three of the walls of the reserve facility is the storage rack system itself. The use of the rack system for this purpose was deliberate, aimed at saving construction costs and increasing storage space.

The racks occupy about 80 percent of the ground floor of the reserve facility, and a typical rack row has vertical columns 50 feet high, anchor-bolted to the floor and topped with horizontal beams to support the roof deck. The shelves reach virtually to the roof, and employees access them by using "transtackers," which move along the aisles but then raise the operator and a load-bearing platform vertically to the appropriate racks. The transtackers draw power from a dedicated electrical system installed at the top of each aisle, somewhat in the manner of an electric trolley.

The reserve facility contains an oil-fired boiler to provide heating. It has an electrical system that is integrated into the rack system, being supported by the racks and other structural elements in the facility. There is a water-based sprinkler system, including sprinklers fixed to the roof and other sprinklers at intermediate levels supported by the racks.

In the case of the 1986 shipping building, L.L. Bean sought the tax credit solely for a storage facility, located within the building, known as the "mezzanine system." The mezzanine system, contemplated when the 1986 shipping building was designed, uses cantilevered shelving attached to rack posts in order to hold merchandise; these rack posts, together with steel frames in other places, are used to support plywood decking which comprises the mezzanine level. At the mezzanine level, further shelving units and some office space and enclosed work areas sit on the plywood deck.

The mezzanine system supports neither the ceiling nor the walls of the shipping building, but it does support the mezzanine floor, thereby reducing construction costs and increasing storage space. Various other elements are connected to, or suspended from the underside of, the mezzanine system, including cable, electricity and communications, lighting fixtures and sprinkler piping. The mezzanine floor is the first stop for freight elevators located in the center of building.

In the tax returns that led to the present litigation, L.L. Bean originally claimed an investment tax credit for the entire reserve facility, as well as the accelerated depreciation and interest expense deduction already described. All of these claims depended on the classification of the reserve facility as section 38 property. The Commissioner disallowed over 80 percent of the claimed tax credit. L.L. Bean also claimed an investment tax credit for the mezzanine system. The Commissioner allowed an investment tax credit for about two-thirds of the amount claimed.

L.L. Bean then filed suit in the Tax Court to dispute the Commissioner's adjustments. A trial was conducted in October 1995, many of the facts being stipulated. Ultimately, the Tax Court wrote a lengthy opinion, containing a very detailed description of the property in question, which rejected L.L. Bean's claims. *L.L. Bean, Inc. v. Commissioner,*

T.C. Memo 1997–175, 73 T.C.M. (CCH) 2560, 1997 WL 166242 (1997). L.L. Bean's appeal to this court followed.

■ On appeal, L.L. Bean argues that even if the reserve facility is not section 38 property, the rack system so qualifies. The Tax Court saw the rack system as having a dual purpose "to hold [the taxpayer's] merchandise and to support the roof and walls that protect the merchandise." Because the rack system provided essential structural support for the walls and roof, the court held that it was a "structural component[ ]" of a "building[ ] or other inherently permanent structure[ ]" and was therefore not tangible personal property. 26 C.F.R. § 1.48–1(c).

L.L. Bean does not dispute the Tax Court's bare factual findings that the rack system is permanent and plays a structural role in supporting the roof and walls. Instead, L.L. Bean argues—as propositions of law subject to *de novo* review—that the racks are tangible personal property under an explicit Treasury regulation; that a "primary function test" should be used and, if used, would qualify the rack system as tangible personal property; and that the Tax Court erred in applying a supposed "more than incidental" structural function test to deny the credit.

It is quite true that the Treasury regulations give as examples of items qualifying for the section 38 credit (as tangible personal property) "such property as production machinery, printing presses, transportation and office equipment [and] ... display racks and shelves ... contained in or attached to a building ...." 26 C.F.R. § 1.48–1(c). Obviously, the credit is available for such items where, as is ordinarily true, they play no structural role in the building. Whether this is so when "such property" is part of the "structural components" of a building is another matter.

Nothing in the regulations, or the statute, indicates that the drafters gave much thought about how to treat items that play a dual role as structural components *and* in functions that, if performed separately, would render them tangible personal property. Arguably, the regulation language favors the IRS since it excludes from credit any items that are "structural components," and it then says that "[t]angible personal property includes all property (*other than structural components*) which is contained in or attached to a building," giving racks and shelves as examples. *Id.* (emphasis added).

On the other hand, it is not easy to imagine that Congress would have wanted a tax credit to be withheld if a hugely expensive printing press were used to help prop up a wall that could as easily be propped up by a 2 by 4 board. Thus, while we readily reject L.L. Bean's "plain language" (but out of context) reading of the regulation's examples, we find of somewhat more interest L.L. Bean's suggestion that where an item both is a structural component and plays a role that would result in the credit if performed by a separate item, the test should be the primary purpose. L.L. Bean points to other areas of the code where primary purpose tests have been adopted. *E.g.*, 26 U.S.C. § 165(c)(2) (governing certain losses from transactions); *see Dewees v. Commissioner*, 870 F.2d 21, 33 (1st Cir.1989).

Yet, it is not clear why L.L. Bean's rack system would qualify for the credit even if this test were adopted. To be sure, a building without the rack system (or some substitute storage arrangements) would not serve L.L. Bean's intended purpose; but since the building would collapse without the rack system, it is pretty hard to describe the roof- and wall-support attributes of the present rack system as secondary. The Tax Court had it right in describing the primary purpose of the rack system as *both* support and storage.

L.L. Bean's last general attack on the lower-court opinion is its claim that the Tax Court misconstrued two earlier revenue rulings in adopting a test that an item did not qualify for a credit if its structural role was "more than incidental." Rev. Rul. 79–183, 1979–1 C.B. 44; Rev. Rul. 79–181, 1979–1 C.B. 41. Although the revenue rulings used this phrase, both rulings could easily be distinguished as essentially decisions on particular facts rather than as establishing any general rule of the kind that L.L. Bean attributes to the Tax Court.

However, the rack system in this case has as a central function the support of the roof and walls of the building, and the Tax Court's outcome is not dependent on whether a "more than incidental" test is used. If L.L. Bean wanted to show that the result in this case should be different, it needed to supply a persuasive basis to show why its rack system—playing a substantial and critical role in the support of the building—is not a structural component or otherwise deserved some form of credit, *see, e.g.,* Tax Ct. R. 142(a); *Uecker v. Commissioner,* 81 T.C. 983, 1983 WL 14907 (1983). This L.L. Bean has failed to do.

■ We turn now to the mezzanine system, for which a full credit was not allowed (no explanation is provided by the parties for the partial credit but perhaps some of the elements are separable). As noted, the system does not itself support the walls or ceiling of the 1986 shipping building, but it clearly performs a structural function—primarily that of providing and supporting the mezzanine floor of the building. To the extent that the system is a dual-purpose structure, our prior discussion governs. But that is not the argument L.L. Bean primarily relies on here.

L.L. Bean's main argument on appeal is that the mezzanine system as a whole is only a temporary structure, which could be removed at any time, an argument springing from the Treasury Regulations' reference to "inherently permanent structures," 26 C.F.R. § 1.48–1(c). Some case law suggests that elements otherwise structural may not fall in that category if they are designed to be easily removable and temporary.[2] Obviously, a grey area must exist between property that is easy to remove and temporary, and property that is inherently a permanent part of the building structure.

It is the frequent business of courts to draw lines in such grey areas. For example, the Eighth Circuit in *Minot* found certain moveable partitions to be sufficiently temporary to qualify as tangible personal property, 435 F.2d at 1372, while in a later case finding

certain non-load-bearing walls to be sufficiently permanent to be classified as structural components, *see Mallinckrodt, Inc. v. Commissioner,* 778 F.2d 402, 403 (8th Cir. 1985) (noting that the walls (or partitions) were not easily removed, and if removed at all would sustain substantial damage).

The Tax Court weighed the various factors set forth in the case law and determined that the mezzanine system was not sufficiently removable and temporary to be tangible personal property. The court noted that by L.L. Bean's estimate it would take six to eight workers a little over a month to remove the system—but that this estimate did not include the time necessary to disconnect the electrical wiring, communication cables, sprinkler systems, and duct work connected to it. 73 T.C.M.(CCH) at 2573. This is a far cry from removable partitions that could be packed up and carried off in a day, and we sustain the Tax Court's ruling.

L.L. Bean's remaining arguments concern not the rack system or the mezzanine system as an entity but rather individual related components for which it independently claims the credit. L.L. Bean first argues that the concrete slab forming the floor supporting the rack system is essentially an item of machinery or equipment. It relies on a case in which the Tax Court had previously held a specially designed and reinforced concrete floor to be tangible personal property. *Texas Instruments, Inc. v. Commissioner,* T.C. Memo 1992–306, 63 T.C.M. (CCH) 3070, 3073–13, 1992 WL 110779 (1992).

Ordinarily, a floor is part of the structure of a building and not entitled to the credit. In *Texas Instruments,* the court deemed the floor—because of its special construction—to be an essential part of the machinery it supported, but a key fact was that the *supported* element was machinery and not itself part of the building. Here, we have already rejected the argument that the rack system is a piece of machinery entitled to the credit. And appellants do not claim that the rein-

**2.** *King Radio Corp. v. United States,* 486 F.2d 1091, 1095 (10th Cir.1973); *Minot Fed. Sav. & Loan Ass'n v. United States,* 435 F.2d 1368 (8th Cir.1970); *Whiteco Indus. Inc. v. Commissioner,* 65 T.C. 664, 1975 WL 3184 (1975).

forced floor was needed to support the transtackers.

■ The next disputed component is the reserve facility's sprinkler system. Treasury Regulation § 1.48–1(e)(2) specifies that sprinkler systems are structural components of a building. L.L. Bean's argument that its reserve facility sprinkler system is not a structural component rests on the grounds that the sprinkler system is attached to the racks, not the building itself, and that the system protects not the building but the inventory on the racks.

We do not think the location of the sprinklers is controlling. As for the argument that the sprinklers protect the contents of the building rather than the building itself, sprinklers ordinarily protect both. Treasury Regulation § 1.48–1(e)(2) does provide an exception for components like heating and air conditioning systems—ordinarily part of the building—where "the sole justification" is to meet requirements of machinery or particular materials within the building (*e.g.*, a special cooling system for frozen food). But there is no proof that this sprinkler system serves so narrow a function.

■ L.L. Bean does invoke the exception just cited for a different component, saying that the sole justification of the reserve facility's heating system is to heat the machinery of the sprinkler system, and that it therefore passes the test of Treasury Regulation § 1.48–1(e)(2). The Tax Court held that L.L. Bean had presented insufficient evidence that the heating system provides for the comfort of employees no more than marginally and that in any case, the sprinkler system was itself a structural component, not the sort of "other machinery" contemplated in the regulation. We agree.

Finally, L.L. Bean argues that 75 percent of the cost of the building's electrical system should be deemed tangible personal property as essentially dedicated to the transtackers. To this end it cites three cases that allocated electrical systems costs to the investment tax credit in proportion to the percentage of the electrical load that powered certain machines: *Morrison, Inc. v. Commissioner*, 891 F.2d 857, 863 (11th Cir.1990); *Illinois Cereal*

*Mills, Inc. v. Commissioner*, 789 F.2d 1234, 1242 (7th Cir.1986); and *Scott Paper Co. v. Commissioner*, 74 T.C. 137, 185–86, 1980 WL 4586 (1980).

The Fourth Circuit has forcefully rejected this approach. *A.C. Monk & Co. v. United States*, 686 F.2d 1058, 1065 (4th Cir.1982); *see also Schrum v. Commissioner*, 33 F.3d 426, 435–36 & nn. 11, 13 (4th Cir.1994). The allocation regime adopted by the Seventh and Eleventh Circuits may be in some tension with the "sole justification" approach adopted in the regulations for air conditioning or heating equipment discussed above. This circuit has not decided the issue, nor need we do so here.

The Seventh and Eleventh Circuits' formula is not the allocation approach that L.L. Bean urges us to adopt for this case, despite L.L. Bean's citation of the cases and some ambiguous language in its brief. The company apparently introduced no evidence as to the proportion of electricity used by the transtackers. Nor did it claim that 75 percent of the electrical system, measured by cost, comprised separate components used only to power the transtackers and so (arguably) were part of the machinery that they powered. *See A.C. Monk*, 686 F.2d at 1065–66.

■ Instead, the company declared in the Tax Court, and repeats here, that 75 percent of the cost of the electrical system is "attributable to" the transtackers. When we looked back into the evidence for the source of the 75 percent figure, it turned out that this figure is plucked from a chart appended to the report of one of L.L. Bean's expert witnesses. The only further information contained in the report is that "[t]he electrical costs were allocated based upon discussions with professional engineers to reflect the functions which the equipment and electrical system serves."

The Tax Court was apparently prepared to consider a credit based on relative use (in line with Seventh and Eleventh Circuit decisions) but found that the evidence did not prove that 75 percent of the electricity was used by the transtackers. We agree with this assessment of the evidence, given the lack of clarity in the report and the absence

of any testimony to explain the figure. *See State Police Ass'n of Mass. v. Commissioner,* 125 F.3d 1, 5 (1st Cir.1997) (review of Tax Court findings only for clear error). Thus we have no occasion to choose between circuits on the question whether such an allocation-by-percentage-of-electrical-use approach is proper.

We have addressed the tax issues presented largely in a mechanical fashion because there is no other choice. Congress was clear about its overall purpose to encourage certain classes of investment. But the statutory lines it drew—in separating favored from ordinary investments—were in some measure artificial, reflecting political choices and arbitrary cut-off points as well as economic aims. Given the gloss of the Treasury regulations, the Tax Court fairly applied the statute as it was written.

*Affirmed.*