T.C. Memo. 2004-188

UNITED STATES TAX COURT

ROBERT D. AND ANA M. SHIRLEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5003-02.                    Filed August 24, 2004.

<u>Jan R. Pierce</u>, for petitioners.

<u>Kelley A. Blaine</u>, for respondent.

MEMORANDUM OPINION

HOLMES, <u>Judge</u>:  This case is about whether the cost of a motor home,[1] bought to be added to a rental fleet, is deductible. The contested deduction is not allowable if a motor home is

---

[1] As early as 1920, enterprising Americans began attaching small homes to Model T chassis to travel the roads in comfort greater than they could have in a car alone.  These improvised efforts evolved into recreational vehicles, or "motor homes" as they are called by those in the industry.

"used predominantly to furnish lodging," but is allowable if a motor home is "used primarily as a means of transportation." It thus asks an imponderable question--when a vehicle can be simultaneously used for both lodging and transportation, how can one tell which use is primary?

## Background

Robert and Ana Shirley were Oregon residents when they filed their petition. Robert Shirley owned Motor Home Rentals, a business in Central Point, Oregon that both rented and sold motor homes. During 1997, his rental fleet had a total of 27 motor homes, including a new 1998 Gulfstream Motor Home that he bought for $48,000 in August and added to his fleet under the designation "MH #22."

His usual terms for motor home rentals were much like those for car rentals--a daily or weekly fee, a daily mileage allowance of 100 miles, and a mileage charge of $.25 for each additional mile. In 1997, petitioner rented his motor homes to numerous customers in a total of 322 transactions, for anywhere between one and 90 days. Most of his customers used fewer than their 100 miles per day.

This case arose from notices of deficiency that respondent issued for 1997 and 1998. Concessions and compromises by both parties completely settled the dispute about the Shirleys' 1998 deficiency, leaving only one issue to decide--whether to allow

petitioners a deduction on their 1997 return for part of the cost of MH #22.  Before the case went to trial, the parties fully stipulated the facts under Rule 122.[2]

## Discussion

Section 179(a) allows a taxpayer a deduction--in 1997, one of up to $18,000--for property (prosaically called "Section 179 property") used in his trade or business that he must otherwise add to his capital account and depreciate.  The deduction comes with numerous restrictions, one of which is that any property described in section 50(b) is ineligible to be section 179 property.  Sec. 179(d)(1).  Section 50(b) itself defines terms for various tax credits and deductions granted elsewhere in the Code.  It excludes certain kinds of property from these benefits, including "property which is used predominantly to furnish lodging or in connection with the furnishing of lodging."  Sec. 50(b)(2).  This is then followed by exceptions to the exclusion, one of which is "property used by a hotel or motel in connection with the trade or business of furnishing lodging where the predominant portion of the accommodations is used by transients." Sec. 50(b)(2)(B).[3]

---

[2] All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code as in effect for the year at issue.

[3] These exclusions first became law in the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, as limits on the then-new investment tax credit.  President Kennedy expected this incentive

(continued...)

The parties agree that MH #22 meets all the requirements for being section 179 property except one:  Respondent argues that motor homes generally, and MH #22 in particular, are property "used predominantly to furnish lodging."  Petitioners disagree with respondent on that point, contending that motor homes are primarily used for transportation.  Petitioners also argue that even if MH #22 is predominantly used for lodging, it qualifies for the exception to the exclusion, because it is lodging the predominant portion of which is "used by transients," since most of petitioners' customers were short-term renters.

Solving this puzzle as the parties have presented it requires answering two preliminary questions.  The first is whether we should focus on MH #22 alone, or on Shirley's motor home business as a whole; the second is whether regulations exist that we can look to in analyzing the question.

Neither party squarely addressed the issue of whether we should look at the "predominant use" of Shirley's fleet of rented motor homes or at the "predominant use" of MH #22 alone, but we do have some usable precedent.  In Van Susteren v. Commissioner, T.C. Memo. 1978-310, we decided that a small businessman who

---

³(...continued)
to stimulate the economy by allowing business owners a credit on their tax bill for purchases of new tangible personal property. H. Rept. 1147, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 402, 411-413.  The credit's purpose was to increase "the profitability of productive investment by reducing the net cost of acquiring new equipment."  Id., 1962-3 C.B. at 411.

bought four mobile homes as additional rooms for his motel was entitled to an investment tax credit.  Over the objections of the Commissioner in that case, we did not separately test each mobile home's eligibility for the credit.  It was enough that each trailer did not "represent a separate trade or business" and that the stipulated facts showed that the taxpayer was operating only a single business.[4]  See also Koerner v. Commissioner, T.C. Memo. 1983-588 n.6 (same).

Shirley was likewise managing his motor home rental enterprise as a single business; he used MH #22 as just one more asset in that business.  We follow Van Susteren and Koerner and will not look to the 1997 use of MH #22 alone; instead, we look to the use of the fleet of motor homes of which it was a part.

Analyzing whether applicable regulations exist begins with the history of section 50.  That section was added to the Code by the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508 (OBRA 1990), sec. 11813(a), 104 Stat. 1388, 1388-536 through 1388-550.[5]  OBRA 1990 essentially reenacted old section 48(a)(3)

---

[4] And because more than half of the total units at his motel (i.e., those in his motel building, plus the mobile homes) were used predominantly by transients, he qualified for an exception to the general exclusion of lodging investments from the credit.

[5] It was enacted as part of an extensive effort by Congress to simplify the Code by amending and deleting numerous provisions that had become obsolete.  The legislative history stresses that there was no attempt to simplify by making substantive changes. H. Rept. 101-894, at 36 (1990); H. Conf. Rept. 101-964, at 1142 (1990).

as new section 50(b)(2).  The Secretary never issued regulations under section 50(b)(2), but the existing Treasury regulations under old section 48(a)(3) have remained unchanged since the time of their issuance in 1964.[6]  The definition of "section 179 property" largely matches old section 48's definition of "section 38 property" that was in the 1954 Code.  Sec. 179(d).  Old section 48(a)(1) defined "section 38 property" as "tangible personal property," and old section 48(a)(3) excluded from that definition "[p]roperty which is used predominantly to furnish lodging or in connection with the furnishing of lodging."  Current section 50(b)(2) is nearly identical to old section 48(a)(3), so we will use the regulations under old section 48 for guidance.

Section 1.48-1(h)(1)(i) of those regulations provides that property eligible for the deduction

> does not include property which is used predominantly
> to furnish lodging or is used predominantly in
> connection with the furnishing of lodging during the
> taxable year.  * * *  The term "lodging facility"
> includes an apartment house, hotel, motel, dormitory,
> or any other facility (or part of a facility) where
> sleeping accommodations are provided and let, except
> that such term does not include a facility used
> primarily as a means of transportation (such as an
> aircraft, vessel, or a railroad car) * * * even though
> sleeping accommodations are provided.

Section 1.48-1(h)(2)(ii) of the regulations then further describes the transient exception to the lodging exclusion:

---

[6] Compare T.D. 6731, 1964-1 C.B. (Part 1) 11, 39-40.

> Property used by a hotel, motel, inn, or other
> similar establishment, in connection with the
> trade or business of furnishing lodging shall not
> be considered as property which is used
> predominantly to furnish lodging or predominantly
> in connection with the furnishing of lodging,
> provided that the predominant portion of the
> lodging accommodations in the hotel, motel, etc.,
> is used by transients during the taxable year.
> For purposes of the preceding sentence, the term
> "predominant portion" means "more than one-half".
> Thus, if more than one-half of the living quarters
> of a hotel, motel, inn, or other similar
> establishment is used during the taxable year to
> accommodate tenants on a transient basis, none of
> the property used by such hotel, motel, etc., in
> the trade or business of furnishing lodging shall
> be considered as property which is used
> predominantly to furnish lodging or predominantly
> in connection with the furnishing of lodging.
> Accommodations shall be considered used on a
> transient basis if the rental period is normally
> less than 30 days.

We adopt, as the parties suggest, this regulation's definition of a transient as one who rents for less than 30 days. We also note that in <u>Moore v. Commissioner</u>, 58 T.C. 1045, 1054 n. 8, affd. 489 F.2d 285 (5th Cir. 1973), we held that "predominant portion" means the <u>proportion of accommodations</u> used by transients, not the proportion of all renters who are transients.

Finally, the parties also agree that section 1.48-1(h)(1)(i), Income Tax Regs., prescribes an all-or-nothing approach. Under this approach, we characterize mixed-used assets according to their predominant use. The regulation thus seems to require us to decide whether an asset was used predominantly for lodging or transportation.

In other sections of the Code and regulations that use similar language, deciding "predominant" means defining a common denominator and then measuring relative size. For example, use of property "predominantly outside the United States" is measured by the time that the property is physically in the United States compared to the time that it is outside, sec. 1.48-1(g)(1)(i), Income Tax Regs.; deciding whether a real estate investment trust is "predominantly held by qualified trusts" is measured by the value of trusts' holdings in the REIT compared to the value of others' holdings, sec. 856(h)(3)(D)(i); and use of a bus "predominantly * * * in furnishing (for compensation) passenger land transportation" is measured by the miles the bus is used to carry paying passengers compared to the miles it travels without them, sec. 48.4221-8(b)(2), Manufacturers and Retailers Excise Tax Regs.

But unlike a bus, which cannot simultaneously carry and not carry paying passengers, a motor home can certainly be used for both transportation and lodging; that is what it is built for. The regulation seems to recognize this as well, since it makes "sleeping accommodations" the sine qua non of "lodging" while recognizing that airplanes, ships, and railroad cars make some provision for passengers who sleep while on board. But the regulation does not tell us what characteristics of airplanes or ships or railroad cars distinguish them from more ordinary

lodgings such as apartment buildings or houses.  The parties disagree about the consequences of this fact.

Petitioner urges us to adopt a bright-line test under which we would consider a motor home as used "predominantly for transportation" where it is regularly used in the taxpayer's business for transportation.  Respondent would have us look to the amount of time spent in the motor homes for transportation versus the time spent in the motor homes for lodging.

The difficulty with both these positions is that neither explains why, in measuring predominant use, one type of use should "count" for more than the other.  Petitioners' position amounts to an assertion that, if motor homes are used for transportation, then transportation is their primary use.  But why this should be so, apart from the ease of administering this as a bright-line test, is unclear.  Respondent asserts that we should use time as a common denominator of uses; if the time spent in Shirley's motor homes while they were traveling exceeded the time spent in them while people were lodging, then and only then would their primary use be transportation.

As petitioners point out, respondent does not suggest how we deal with the problem of simultaneous use--some family members sleeping, eating or cooking in the back while one drives.  Nor does respondent suggest how, in the real world, any businessman could possibly rely on his rental customers to maintain the

detailed, almost minute-by-minute logs required for this test to work.[7]

Other tests are possible.  One could conceive of a test that looked to the value of the mobility of the motor home to the renter versus the value of its capacity to be used for lodging. Or one could try to identify the "primary function" of a motor home (though this would seem to be the same as trying to identify its "primary use.")[8]  But none of these tests--including both petitioners' and respondent's--suggests a way out of the

---

[7] Respondent's position is weakened by the reality that property undoubtedly used for transportation--cars, for example--are at rest in garages and parking lots much longer than they are on the road.  We do note that in LaPoint v. Commissioner, 94 T.C. 733, 735 (1990), the parties stipulated that the taxpayer used a car for business uses "85 percent of the time", but we are not sure how to construe it.  It seems unlikely this meant total time rather than percentage of time in use, but it could also have meant percentage of trips or even mileage (if the taxpayer in LaPoint kept the usual log for those wishing to deduct car-related expenses).  In any event, the key issue in that case was whether the car was used "predominantly * * * in connection with the furnishing of lodging" id. at 736, and so it gives limited help in analyzing the question of simultaneous use of motor homes for both lodging and transportation.

[8] In L.L. Bean, Inc. v. Commissioner, T.C. Memo. 1997-175, affd. 145 F.3d 53, 56 (1st Cir. 1998), we had to decide whether a rack system inside a warehouse, which both held merchandise and supported the warehouse's walls and roof, was tangible personal property.  Taxpayers proposed a primary function test, as opposed to a strict structural function test.  The Court, however, found that even a primary function test would not favor petitioners because the necessity of the rack system to prevent a collapse of the building did not allow the structural function to be categorized as secondary.

underlying dilemma of comparing a motor home's use as lodging to its use as transportation.

We think a better way to analyze whether mobile homes were predominantly used for lodging lies in <u>Union Pacific v. Commissioner</u>, 91 T.C. 32 (1988). In <u>Union Pacific</u>, railroad employees who tested and replaced track in remote locations lived in company-supplied, rent-free mobile homes. Union Pacific paid these employees their normal wages and benefits and argued that this meant the housing was just a required part of new track installation, the type of productive activity that Congress meant to qualify as creditable. Union Pacific thought the distinction was important because the purpose of the investment tax credit (like the purpose of section 179) was to stimulate production.

We have looked to the legislative history of the investment tax credit for help in construing the meaning of its terms. In <u>Norwest Corp. v. Commissioner</u>, 108 T.C. 358, 365 (1997) we noted that Congress expressly said that the phrase "tangible personal property" should not be narrowly defined. In <u>Union Pacific</u>, we similarly noted that the legislative history of the lodging exception showed that investment in "'[l]odging, or residential real estate, * * * is excluded on the grounds that this property for the most part is used by consumers rather than in production.'" <u>Union Pacific v. Commissioner</u>, <u>supra</u> at 39, (quoting Staff of Joint Comm. on Taxation, General Explanation

of Committee Discussion Draft of Revenue Bill of 1961, at 9
(J. Comm. Print 1961)).  We nevertheless held that, in deciding
whether the mobile homes at issue were used predominantly for
lodging, the key factor was the alternative to company-paid
accommodations their inhabitants would likely have bought.  We
reasoned that "they are nonetheless used by individuals to
replace assets that clearly would not be [qualifying property]--
if * * * housing were not provided to the * * * employees, those
employees would be forced to either rent or buy other housing."
Id.  This substitute housing, it was implied, could not be
qualifying property because it was residential real estate.  Of
course, from Union Pacific's viewpoint, the mobile homes were
part of its productive investment, even if they were also used
for lodging.

Union Pacific is thus some guide to the general problem of
how to characterize property capable of two simultaneous uses.
As in Union Pacific, we must ask what Shirley's customers would
have had to buy or rent if motor homes were not available.  If
these substitute goods would be allowed as qualifying property
under section 50(b), then so would motor homes.  Shirley's
customers, unlike the railway workers in Union Pacific, would
need as substitute goods some combination of both lodging and
transportation.  If a car or truck were rented to customers to
provide them with the mobility of a motor home, those vehicles

would clearly qualify as section 179 property. But what would substitute for the lodging accommodations a motor home provides? We know from the stipulated facts that the predominant number of motor home rentals were for less than 30 days.[9] This strongly suggests that Shirley's customers would rent hotel or motel rooms, campground space, or other transient lodging. All of these would qualify for the exception to the general exclusion of lodging from the category of section 179 property.

Because both the substitute transportation and the substitute lodging would qualify, we conclude that motor homes, like Shirley's, used by renters mostly for periods of less than 30 days, are section 179 property. As we have in other cases of deciding eligibility for the investment tax credit,[10] we leave grappling with a difficult element of a difficult test for another case. In this one, petitioners are allowed a deduction under section 179 for the purchase of MH #22 in 1997.

To reflect the other concessions and compromises already made by the parties,

---

[9] The stipulated evidence shows that 24 of Shirley's 27 motor homes were rented to transients more than half the time that those 24 motor homes were rented during 1997.

[10] See, e.g., Tibbs v. Commissioner, T.C. Memo. 1987-515 (avoiding decision on whether mobile homes were "tangible personal property"); Pickren v. Commissioner, T.C. Memo. 1981-52 (avoiding decision on whether mobile homes qualified as hotel or motel).

- 14 -

<u>Decision will be entered under Rule 155</u>.